

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-16-2003

# Suders v. Easton

Precedential or Non-Precedential: Precedential

Docket 01-3512

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Suders v. Easton" (2003). *2003 Decisions.* Paper 585.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/585

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 16, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3512

NANCY DREW SUDERS,

Appellant,

v.

ERIC D. EASTON, WILLIAM D. BAKER, ERIC B.
PRENDERGAST, VIRGINIA SMITH ELLIOTT, AND THE
PENNSYLVANIA STATE POLICE

On Appeal from the United States District Court
for the Middle District of Pennsylvania

District Court Judge: The Honorable Sylvia H. Rambo
(00-CV-01655)

Argued on April 11, 2002

Before: McKEE and FUENTES, *Circuit Judges*, and
POGUE,* *Judge*

(Opinion Filed: April 16, 2003)

Don Bailey (argued)
4311 N. 6th Street
Harrisburg, PA 17110

*Attorney for Appellant*

* The Honorable Donald C. Pogue, United States Court of International
Trade, sitting by designation.

D. Michael Fisher
Attorney General
Sarah C. Yerger (argued)
Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

*Attorneys for Appellees*

---

**OPINION OF THE COURT**

---

FUENTES, *Circuit Judge*:

In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), the Supreme Court addressed the scope of the vicarious liability of an employer for the discriminatory and harassing conduct of its supervisors in the context of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). The Court also sought to clarify the confusion among the Courts of Appeals as to the scope and proper grounds for such liability. To that end, the Court held that an employer shall be strictly liable to a victimized employee for an actionable hostile work environment created by a supervisor, when the discrimination or harassment at issue results in a "tangible employment action."[1] *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at

---

1. The concept of a tangible employment action is distinct from that of a materially adverse employment action which is a necessary element of a prima facie case under Title VII. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997); *see also St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993). Litigants, and oftentimes courts, confuse the two. *See Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 743-44 (7th Cir. 2002) (discussing courts' use of the terms "tangible employment action" and "materially adverse employment action."). Courts have yet to address the differences between them. It is worth noting generally that because *Ellerth* and *Faragher* create a rule of strict liability, we understand a tangible employment action as being a narrower, more restricted category of actions occurring in the workplace.

807. Furthermore, the Court defined a tangible employment action in general, categorical terms: "a significant change in employment status," often, but not always, resulting in economic injury. *Ellerth*, 524 U.S. at 761-62; *see also Faragher*, 524 U.S. at 808. A tangible employment action was also defined by reference to a non-exclusive list of possible actions: "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761; *see also Faragher*, 524 U.S. at 790. When no tangible employment action results, the employer may still be liable, but it may raise an affirmative defense to liability or damages. The affirmative defense has two components: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

Against this backdrop, the matter on appeal raises novel issues of law of critical importance to civil actions brought in our Circuit pursuant to Title VII. Among those we are asked to review, we address today the issue of whether a constructive discharge constitutes a tangible employment action, such that the affirmative defense to the liability of an employer for the discriminatory conduct of its supervisors would not be available to the employer. Although our analysis is informed by the Supreme Court's decisions in *Ellerth* and *Faragher*, our ruling today necessarily reaches issues that were not specifically addressed by the Court in either of those two decisions.

In the underlying action, plaintiff Nancy Drew Suders ("Suders") alleged that she was subjected to a sexually hostile work environment and discriminated against on the basis of her age and political affiliation. She also contended that she was constructively discharged. Suders identified three officers of the Pennsylvania State Police ("PA State Police") as the primary harassers and sought to hold the PA State Police vicariously liable for the actions of its agents. After the close of discovery, defendants moved for summary

judgment. The District Court granted the motion in its entirety. As to her claim of a sexually hostile work environment, the District Court found that, although Suders had raised genuine issues of material fact as to each requisite element, the PA State Police was entitled to raise the affirmative defense set forth in *Ellerth* and *Faragher*. Having found that the PA State Police met its burden of establishing the affirmative defense, the District Court granted summary judgment as to Suders's claim of a sexually hostile work environment. The Court failed to address Suders's claim of constructive discharge and whether such a claim would affect the availability of the PA State Police's assertion of the affirmative defense.

We will reverse the District Court's judgment as to Suders's claim of a sexually hostile work environment. In so doing, we hold that a constructive discharge, when proved, constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher*. Consequently, when an employee has raised a genuine issue of material fact as to a claim of constructive discharge, an employer may not assert, or otherwise rely on, the affirmative defense in support of its motion for summary judgment.

## I.

### A.  Background[2]

Suders is a wife and mother of three children. From approximately 1988 until her employment with the PA State Police, Suders was Chief Deputy Sheriff and Secretary to the Fulton County Sheriff. She had a wide array of responsibilities, including bookkeeping, transporting prisoners, serving warrants, and administering special programs. Suders also served as an active member of the local chapter of the Republican Party. In connection with her political activities, she became acquainted with Mikael Fix, the Republican County Chairman, and Robert

---

2. In our review of the factual background, we must resolve all factual doubts and draw all reasonable inferences in favor of Suders, the party opposing the motion for summary judgment. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1077 n.1 (3d Cir. 1996).

Jubelirer, a State Senator. Sometime in 1998, these individuals suggested to Suders that she apply for an open position with the PA State Police. When she decided to apply, Chairman Fix assisted Suders in her application.

During the pendency of her application and before accepting a position, Suders heard from the Fulton County Sheriff that officers of the PA State Police were opposed to her candidacy because they viewed her as a political appointment. The extent to which Republican party officials intervened on behalf of Suders is unclear. Nevertheless, Chairman Fix eventually told Suders that the PA State Police had approved her application.

Suders accepted a position as a police communications operator ("PCO") with the PA State Police and commenced her employment on or about March 23, 1998, at the McConnellsburg barracks. Her employment began with a probationary period, during which Suders worked alongside another PCO. In June 1998, Suders attended a formal, two-week training program, after which she undertook the duties of a PCO by herself.

Starting from her probationary period and steadily escalating after her two-week training period, Suders alleged that she suffered mistreatment and sexual harassment so severe that she ultimately felt compelled to resign on August 20, 1998. She recounts several instances of name-calling, repeated episodes of explicit sexual gesturing, obscene and offensive sexual conversation, and the posting of vulgar images. According to Suders, the following defendants were the main perpetrators of the sexual harassment that she allegedly suffered: Sergeant Eric D. Easton ("Easton"), Station Commander of the McConnellsburg barracks; Patrol Corporal William D. Baker ("Baker"); and Corporal Eric B. Prendergast ("Prendergast").

As Station Commander, Sergeant Easton was responsible for the day-to-day supervision of the McConnellsburg barracks. Even before she commenced her employment with the PA State Police, Suders encountered problems with Easton. Easton told Suders that he had some concerns about her and that anything she would say would simply be her word against his. Suders also recalled that every

time she would go into Easton's office, "he would bring up [the subject of] people having sex with animals. . . . [T]hat's all the man wanted to talk about." *Suders v. Easton*, No. 00-CV-1655, slip op., at 3 (M.D. Pa. Aug. 16, 2001) (the "*Decision*") (quotations and citations omitted). Easton and Prendergast often had discussions in front of Suders, and on one occasion, Easton stated that "if someone had a daughter, they should teach her how to give a good blow job!" App. at 151. Easton once commented to Suders that his wife had small breasts.

Easton also made disparaging remarks about Suders's age. He commented to Suders that "[i]t is awful getting old, isn't it Nancy?" *Decision*, at 2 (quotations and citations omitted). Easton also remarked that "a 25-year-old could catch on faster than [Suders] could." *Id.* at 3 (quotations and citations omitted).

The sexually charged nature of Easton's conduct toward Suders was not limited to conversation. She was offended "when Defendant Easton, wearing spandex shorts, would sit down in the chair [near Plaintiff's work space], put his hands behind his head and spread his legs apart." *Id.* (quotations and citations omitted). She claimed that Easton would leer at her. Suders conceded that Easton never made any overt sexual advances towards her, but she had no idea "what he was going to do." *Id.* (quotations and citations omitted). Suders avoided Easton to the extent possible.

Easton did not deny making many of the statements above; instead he claimed that Suders misinterpreted them. As to the statements concerning Suders's age, Easton allegedly made them in order to defend Suders and to explain why she might be having trouble catching on to the job. With regard to the statements concerning bestiality and oral sex instruction, Easton claimed that they pertained to actual investigations. Easton also noted that Suders was generally disorganized, frequently late for work, and easily overwhelmed by her job responsibilities. When he attempted to offer constructive criticism, he claimed that Suders did not handle it well.

As a Patrol Corporal at the McConnellsburg barracks, defendant Baker also had a supervisory role at the station.[3]

_____

3. Sergeant Easton explained that "[e]ach corporal had some similar duties as far as running the shift, responding to incidents depending on

According to Suders, Baker was responsible for the most inflammatory harassment that she suffered. Soon after she began working at the communications desk by herself, Suders recalled that Baker had a habit of making obscene gestures to her, as many as five to ten times per night throughout her five-month tenure at the station. These gestures followed the same pattern. In an apparent imitation of a move popularized by televised wrestling, Baker would "cross his hands, grab hold of his private parts and yell, suck it." App. at 65. Suders recalled that "[t]he man did this, and he would beat on it. He would beat his hands on his crotch too and yell suck it. He would ask me to do this garbage. . . . All he wanted to do was play with his crotch." *Id.* at 65-66. Suders claimed that Baker kept a picture near his work space of a professional wrestler performing this same gesture. In between these offensive acts, Baker would take time to rub his rear end in front of her and remark "I have a nice ass, don't I?" *Id.* at 67. Another time, Baker announced to Suders, without invitation, that he intended to pierce his genitals and that his wife would pierce her nipple. Baker also referred to Suders as "momma." *Decision*, at 5 (quotations and citations omitted).

On one occasion, Suders confronted Baker about his offensive conduct, specifically about his repeated gestures. She told him "I don't think you should be doing this." App. at 66. According to Suders, Baker responded by grabbing a straight back chair in the communications room, jumping onto it, and repeating the move, including the verbal exclamation.

As a Corporal, defendant Prendergast shared some supervisory authority with Baker.[4] Suders contended that

the severity of the incident, and each corporal had some specialized duties. . . . Then each corporal also had specific personnel assigned to them to supervise." App. at 215.

4. As Easton noted, "Eric Prendergast I believe was the corporal who was assigned to [Suders], but if he was not working say a three to eleven shift, then it would be whatever corporal was working that shift would be in charge of the shift." App. at 224.

Prendergast verbally harassed her day after day. He called Suders a liar and told her that "the village idiot could do her job." App. at 69. She also testified that Prendergast would wear black gloves, pound on the furniture in the communications room, and intimidate her. According to Suders's complaint filed on September 18, 2000, Prendergast allegedly told her that she would be "the last political appointee who had a job there at the substation." *Id.* at 30.

As often happens in cases involving allegations of sexual harassment, the defendants' recollections of the events differ from Suders's. The testimony of the PA State Police officers is notable, however, for its internal inconsistencies and ambiguities. For instance, Baker adamantly denies that he ever performed the wrestling gesture in front of Suders. When asked if he ever saw this harassment take place, however, Prendergast seemed to deny any recollection at first, but then conceded that he may have seen Baker perform it on one occasion. *Id.* at 252.

As noted above, Suders attempted to confront at least one of the defendants, Baker, by asking him to stop the offensive conduct. She did not, however, report any of the incidents to anyone else at the McConnellsburg barracks. In her own words, Suders explained that "there was no one on that station that I could go to. I had a sergeant there who was talking about abusing children and bestiality. There was no way I was going to be able to tell him. There was nobody." *Id.* at 68.

In the summer of 1998, the relationship between Suders and the defendants rapidly deteriorated in a series of events that led to her departure. It began when an accident file turned up missing. Baker asked Suders if she had the misplaced file, and when she responded that she did not, Prendergast accused her of taking the file home. *Decision*, at 5.

At this point, the situation was critical enough that Suders sought help from persons outside the McConnellsburg barracks. During her formal training in June 1998, Suders approached defendant Virginia Smith-Elliott ("Smith-Elliott"), who, in her capacity as Equal

Employment Opportunity Officer of the PA State Police, had taught a training class on sexual harassment that Suders had attended. Without mentioning details, Suders told Smith-Elliott that she might need some help. Smith-Elliott gave Suders her phone number. Neither Suders nor Smith-Elliott followed up on the matter.

On July 22, 1998, Suders received a supervisor's notation for failing to complete an assignment given to her back in May. Days later, on July 26, 1998, Suders was reprimanded again, ostensibly because she had not properly disseminated information about an escaped convict from Ohio. Suders claimed that she received advice from someone at the station that she need not worry about the message because the escapee was from Ohio. Based on that advice, Suders simply placed the information in a Corporal's bin. During this time period, the sexual harassment noted above continued unabated.

On or about August 18, 1998, Suders reached a breaking point. She contacted Smith-Elliott again, and this time, Suders specifically mentioned that she was being harassed and that she was afraid. According to Suders, Smith-Elliott was insensitive and unhelpful. Smith-Elliott instructed her to file a complaint on a standard form without telling Suders where to obtain the form. Suders attempted to find the correct form in employee manuals, but never found it. She was fearful that Prendergast was watching her every move. For her part, Smith-Elliott acknowledged that Suders contacted her around then, but that Suders never mentioned any incidents of sexual harassment, complaining only of age and political affiliation discrimination. Smith-Elliott also recalled that she promised to send Suders the proper complaint form.

Two days after the phone conversation with Smith-Elliott, one final incident proved to be the last straw. Suders alleged that, on August 20, 1998, the other officers set her up and falsely accused her of theft. The events leading up to the incident occurred as follows. Officers of the PA State Police were required to take an exam designed to measure computer skills. The results were supposed to be sent to Hollidaysburg, where the department in charge of officer education was located. Suders took the exam several times,

and each time her supervisors told her that she had failed. She believed that the officers lied to her about the test results and that they never sent her test scores to Hollidaysburg because she found her exams in a set of drawers in the women's locker room. Suders contended that those drawers were not assigned to any specific officer, while the PA State Police countered that the drawers contained another PCO's private belongings.

At some point, the officers realized that Suders's test results were missing. The officers dusted the drawers and the file inside with a theft detection powder that is invisible to the eye, but reacts when touched by hand, thereby turning the hand of a suspected thief blue. Suders testified that, on that day, she sought to return the papers that she had earlier obtained. Her hands turned unmistakably blue. When the officers in the barracks apprehended Suders, they treated her as they would an accused suspect. She was handcuffed, photographed, and questioned. She felt "abused, threatened and held against her will." *Decision*, at 7 (quotations and citations omitted).

Any prospect for reconciliation was now lost. Suders had prepared a written resignation prior to the events of August 20, 1998 and had been carrying it with her. After the accusation of theft and the questioning by her supervisors, Suders tendered her resignation. When Suders attempted to leave the barracks, Baker told her that she could not leave because she was a "suspect." *Id.* Later, the officers took Suders into an interrogation room, where Easton advised Suders of her *Miranda* rights. After being detained for further questioning, Suders demanded to be released. When Suders reiterated her intent to resign, Easton ultimately permitted her to leave.

### B. The District Court's Decision

In the underlying action, Suders asserted that she was discriminated against on the basis of age, political affiliation, and sex. Her claims were based on the following statutes: (1) the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); (2) Title VII; and (3) the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. § 951, *et seq.* ("PHRA"). Suders brought all three claims

against Easton, Baker, Prendergast, Smith-Elliott, and the PA State Police.

After the close of discovery, defendants moved for summary judgment. The District Court granted the motion in its entirety. First, the District Court held that neither Title VII nor the ADEA contemplates the liability of individual employees. The Court cited our decisions in *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 184 (3d Cir. 1997), and *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir. 1996), in granting summary judgment in favor of the individual defendants on Suders's Title VII and ADEA claims.

With respect to Suders's ADEA claim against the PA State Police, the Court held that the Eleventh Amendment barred the claim against a state agency. *Decision*, at 12 (citing *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000)). The Court also noted that, because Eleventh Amendment immunity extends to similar claims based on state law causes of actions, Suders's PHRA claim against the PA State Police was also barred.

With regard to the PHRA claims against the individual defendants, the defendants argued that the Eleventh Amendment immunity enjoyed by the PA State Police also barred any claim against a state official for actions taken within the course of employment. Therefore, the defendants contended that, to the extent that the PA State Police was immune from Suders's claim under the PHRA, the individual defendants were also immune from those claims. The District Court observed that Suders had not responded to this argument and, therefore, granted summary judgment in favor of the individual defendants on the PHRA claims.

The District Court's analysis left Suders with two claims pursuant to Title VII: her hostile work environment and constructive discharge claims against the PA State Police. The Court found that Suders had marshaled enough evidence to raise a genuine issue of fact as to each of the following elements of a Title VII action against an employer: (1) the work environment was sufficiently hostile to constitute intentional discrimination; (2) the discrimination

was pervasive and regular; (3) the defendants' conduct detrimentally affected Suders; and (4) the defendants' conduct was sufficiently hostile to offend a reasonable person. *Decision*, at 13-15 (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990)).[5]

On the issue of vicarious liability, however, the District Court proceeded with an analysis of the affirmative defense set forth in *Ellerth* and *Faragher*. In that regard, the Court found that "as a matter of law . . . [Suders] unreasonably failed to avail herself of the [PA State Police's] internal procedures for reporting any harassment. This is especially true as [Suders] had personal contact with the Affirmative Action officer early in her employment, but failed to pursue this avenue of complaint." *Decision*, at 18. Therefore, the District Court found no genuine issue of material fact as to the PA State Police's assertion of the affirmative defense. The Court thus granted the motion for summary judgment on Suders's remaining claim pursuant to Title VII.

The District Court did not address Suders's claim of constructive discharge. As a result, the Court never reached the issue of whether the claim of constructive discharge would affect the availability of the affirmative defense invoked by the PA State Police.

## II.

The District Court had jurisdiction over the underlying action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367. We have jurisdiction to review the final order of the District Court pursuant to 28 U.S.C. § 1291.

Our review of the District Court's grant of summary judgment is plenary. *See Doe v. County of Centre, PA*, 242 F.3d 437, 446 (3d Cir. 2001). As we have stated in the past, in the context of summary judgment, we must apply the same test that the District Court applied. *See id.*; *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227, 1229 (3d Cir. 1988).

Pursuant to Rule 56(c) of the Federal Rules of Civil

---

5. *See* part III.A, *infra*, for a discussion of the *Andrews* test.

Procedure, a district court may grant a motion for summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We must view the evidence presented to the trial court, and any reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *See Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). When the factual assertions of the party opposing the motion conflict with those of the movant, we must resolve those conflicts in favor of the former. *See Levendos*, 860 F.2d at 1229 (citing *Jackson v. University of Pittsburgh*, 826 F.2d 230, 232 (3d Cir. 1987), *cert. denied*, 484 U.S. 1020 (1988)).

## III.

Our analysis begins with the specific claim which Suders appeals, that is, her claim of a sexually hostile work environment pursuant to Title VII. Then, we address the propriety of the District Court's decision to permit the PA State Police to invoke the affirmative defense to strict liability.

### A. Suders's Claim of a Sexually Hostile Work Environment

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), the Supreme Court recognized that an employee who has been sexually harassed has a cause of action pursuant to Title VII if the sexual harassment at issue was either a *quid pro quo* scenario, or if the harassment was so pervasive that it had the effect of creating a hostile work environment and of altering the conditions of employment. In the present case, Suders alleged a violation of Title VII based on the second scenario set forth in *Meritor*: a hostile work environment at the McConnellsburg barracks.

Shortly after the Supreme Court's decision in *Meritor*, we addressed a number of issues relating to the burgeoning jurisprudence of sexual harassment. *See Andrews*, 895 F.2d at 1482. In *Andrews*, we held that an employee seeking to bring a hostile work environment claim against his or her employer must establish the convergence of five factors: (1) the employee suffered intentional discrimination because of his or her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the employee; and (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position.[6] 895 F.2d at 1482; *see also Knabe v. The Boury Corp.*, 114 F.3d 407, 410 (3d Cir. 1997).

In *Andrews*, we also discussed a plaintiff's burden with respect to each of the factors. With regard to the first factor, we noted that intentional discrimination is implicit in cases involving "sexual propositions, innuendo, pornographic materials, or sexual derogatory language." *Andrews*, 895 F.2d at 1482 n.3. In such cases, the intent to discriminate "should be recognized as a matter of course." *Id.* The second factor requires that the "incidents of harassment occur either in concert or with regularity." *Id.* at 1484 (quotations and citations omitted). The third factor is a subjective inquiry of whether the particular plaintiff was demonstrably injured. *See id.* at 1483. And the fourth factor injects a requirement of objectivity: it ensures that employers are held liable only when the work environment is hostile from the standpoint of a reasonable person. *See id.* at 1483 (noting the need to protect employers from "hypersensitive" employees, but recognizing "the goal of equal opportunity" and "the walls of discrimination that deprive women of self-respecting employment.").

---

6. The fifth factor of the *Andrews* test is respondeat superior liability. Of course, in the context of the vicarious liability of an employer for the acts of its supervisors, the analysis under the fifth factor is materially altered by the Supreme Court's decisions in *Ellerth* and *Faragher*. Accordingly, we devote Part III.C, *infra*, to discussing this issue. For present purposes, our discussion of Suders's hostile work environment claim is limited to the first four factors.

When assessing the relevant factors, we are reminded to view the record as a whole and admonished against focusing on either one particular factor or a specific incident: "Particularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Id.* at 1484; *see also Knabe*, 114 F.3d at 410.

With these principles in mind, we agree with the District Court insofar as it held that Suders had raised genuine issues of material fact as to her claim of a sexually hostile work environment. Drawing all reasonable inferences in her favor, Suders established all of the following:

> (1) her own Station Commander had a preoccupation with discussing bestiality and oral sex with her;

> (2) Easton's "conversations" were accompanied by leering and suggestive posturing—conduct that Suders found offensive;

> (3) Baker routinely engaged in sexually-charged acts intended to humiliate or demean Suders, even after he was politely asked to stop. Viewed in the most generous light, his repeated reenactments of the wrestling move were indicative of an immense immaturity and could reasonably be perceived as innuendo; and

> (4) When not making offensive gestures with his crotch, Baker attempted to engage Suders in conversations about piercing his genitals.

Although this brief summary does not catalog all of the offensive conduct alleged, it is sufficient to show that a reasonable jury could find that the work environment at the McConnellsburg barracks was rife with hostility and sexual innuendo. There is no question that under the standard set forth in *Andrews*, Suders has raised genuine issues of material fact as to the intentional nature of the discrimination at the McConnellsburg barracks.

It is also clear that Suders offered evidence sufficient to establish a pattern of sexual harassment that was pervasive and regular. Particularly telling is Baker's repetition of the wrestling move five to ten times per shift. In addition, Easton's conduct, although not daily, occurred with regularity. Together, Baker's and Easton's conduct is sufficient to raise a genuine issue of material fact as to the second factor in *Andrews.*

In addition, both the subjective and objective components of the *Andrews* test are satisfied here. Because of the severe and pervasive harassment of her supervising officers, Suders felt that her only recourse was to draft a resignation letter. With respect to the objective standard, the District Court found that "there was enough conduct in the instant action to raise an issue of fact that the atmosphere was sufficiently hostile to offend a reasonable person in Plaintiff's position. Most persuasive is Plaintiff's testimony regarding the 'wrestling move' that Defendant Baker allegedly repeated five to ten times during each shift that he worked with Plaintiff." *Decision,* at 14-15.

Up to this point in the analysis, we are in complete agreement with the District Court. Suders presented compelling evidence sufficient to raise genuine issues of material fact on her claim of a sexually hostile work environment. We part company with the District Court, however, in the balance of its analysis relating to the liability of the PA State Police. Although it concluded that Suders had marshaled enough evidence to survive the motion for summary judgment, the District Court proceeded to consider the affirmative defense set forth in *Ellerth* and *Faragher.* Ultimately, it found that the PA State Police was entitled to assert the defense and that there were no issues of fact justifying trial on the merits. Thus, the Court granted summary judgment as to Suders's Title VII claim against the PA State Police.

We believe that the District Court's analysis was fundamentally flawed for two reasons. First, even if the PA State Police could assert the affirmative defense, disputed issues of fact relating to the defense preclude summary judgment here. While the PA State Police contended that it had an effective remedial program in place to address

sexual harassment claims, Suders never found the complaint form necessary to trigger an investigation. Moreover, Suders contacted Smith-Elliott twice. The first time, Suders alluded to potential problems and stated that she might need assistance. No attempt was made to follow up on Suders's initial contact. The second time, Suders contended that Smith-Elliott was entirely unhelpful, appearing insensitive at times. On this record, it is unclear whether the PA State Police exercised reasonable care to prevent or correct the sexual harassment that Suders claimed she suffered. Accordingly, the grant of summary judgment on the basis of the affirmative defense was improper.

Second, and more importantly, the Court did not consider Suders's claim of constructive discharge and whether a claim of constructive discharge would affect the availability of the affirmative defense.

## B. Constructive Discharge

Suders argued that, as a result of the pervasive sexual harassment and discrimination at the McConnellsburg barracks, she had no alternative but to resign. In other words, she contended that her departure, although voluntary in the strict sense of the word, was a constructive discharge because of the hostile work environment that she endured. To the extent that the District Court did not recognize a claim of constructive discharge, we hold that the Court erred. The allegations of constructive discharge were apparent on the face of Suders's complaint. In the very first paragraph, Suders alleged that she was "forced to suffer a termination of employment because she would not yield to sexual suggestions, innuendoes and solicitatious [*sic*] behavior." App. at 27. She also stated that "when defendants, by and through [PA State Police] operatives, on August 20, 1998, threatened plaintiff, she felt she had no choice but to resign, and did so out of fear." *Id.* at 34. The record is also replete with testimony relating to harassment, discrimination, false charges of theft, and Suders's eventual resignation. Therefore, we will address the merits of Suders's claim of constructive discharge based on the record presented in the District Court, an inquiry

that should have been performed in the first instance by the trial court.

In *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887 (3d Cir. 1984), we first recognized that "acts of discrimination in violation of Title VII can make working conditions so intolerable that a reasonable employee would be forced to resign." Noting that the Courts of Appeals were divided as to the findings necessary to support a constructive discharge claim, we adopted an objective standard, as opposed to a specific intent standard: "We hold that no finding of a specific intent on the part of the employer to bring about a discharge is required for the application of the constructive discharge doctrine. The court need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* at 888. In adopting the objective standard, we held that a plaintiff-employee may prevail on a claim of constructive discharge by establishing that "the conduct complained of would have the *foreseeable* result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Id.* at 887-88 (citations omitted) (emphasis added); *see also Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992) (citing *Goss*).

In *Goss*, we were convinced that the objective standard had been met because (1) plaintiff, a saleswoman, was verbally harassed by her supervisor about her plans to have children; (2) after taking sick leave as a result of a miscarriage, her sales territory had been taken away and replaced with a less lucrative territory; and (3) when she objected, plaintiff was told to either accept the assignment or resign. 747 F.2d at 888.

In subsequent decisions, we have elaborated on the requirements of a constructive discharge claim. For instance, we have rejected the imposition of an "aggravating circumstances" requirement often imposed by other Courts of Appeals.[7] *Aman*, 85 F.3d at 1084 (citing *Levendos*, 860

_____

7. In that regard, we noted that "we cannot state as a broad proposition of law that a single non-trivial incident of discrimination can never be

F.2d at 1232). Therefore, in *Aman*, we held that "[t]he fact that [plaintiff] had been subject to continuous discrimination during her employment could support a conclusion that she simply had had enough. No other precipitating facts were legally required." 85 F.3d at 1084.

Despite our rejection of an aggravating circumstances requirement, we have stated that a plaintiff claiming constructive discharge must demonstrate that the alleged discrimination surpasses "a threshold of 'intolerable conditions.'" *See Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 169 (3d Cir. 2001); *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir. 1998). In *Connors*, we noted that

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign; presumably every resignation occurs because the employee believes that it is in his interest to resign. Rather, "[i]ntolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign,"—that is, whether he would have had no choice but to resign.

160 F.3d at 976 (emphasis in original) (quoting *Blistein v. St. John's College*, 74 F.3d 1459, 1468 (4th Cir. 1996)).

---

egregious enough to compel a reasonable person to resign. An employment discrimination plaintiff may simply face a more difficult burden of proof in establishing the employer's liability, when relying on a single discriminatory incident as a basis for arguing the occurrence of constructive discharge." *Levendos*, 860 F.2d at 1232; *see also Aman*, 85 F.3d at 1084.

When we decided the appeal in *Levendos*, at least three Courts of Appeals had articulated an aggravating circumstances requirement. *See Levendos*, 860 F.2d at 1232 n.9 (citing *Nolan v. Cleland*, 686 F.2d 806, 813 (9th Cir. 1982); *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir. 1981); *Clark v. Marsh*, 665 F.2d 1168 (D.C. Cir. 1981)).

In *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir.), *cert. denied*, 510 U.S. 964 (1993), we sought to refine these requirements further by identifying several situations that may be indicative of constructive discharge: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations. Our identification in *Clowes* of situations that often accompany constructive discharge was not intended to be exhaustive; rather the situations were intended "to illustrate *some* of the factors on which plaintiffs claiming constructive discharge have relied." 991 F.2d at 1161 n.1 (emphasis added); *see also Duffy*, 265 F.3d at 168 ("[W]e have never made the *Clowes* factors an absolute requirement for recovery. . . . The absence of the factors in *Clowes* is not necessarily dispositive."). Nevertheless, the situations delineated in *Clowes* have assisted courts in our Circuit over the years in identifying meritorious constructive discharge claims. *See, e.g., Duffy*, 265 F.3d at 168 ("The District Court correctly recognized that Duffy had failed to demonstrate any of the factors listed in *Clowes*.").

Furthermore, we recognized another important consideration in *Clowes* that relates to the inquiry of whether a reasonable person would have felt compelled to resign: "As other courts of appeals have noted, a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." 991 F.2d at 1161 (citations omitted). We underscore that this consideration does not amount to a *quasi* exhaustion requirement: "We do not require such steps to be taken in all cases. An employee may be able to show working conditions were so intolerable that a reasonable employee would feel forced to resign without remaining on the job for the period necessary to take those steps." *Id.* at 1162 n.6. Therefore, it is relevant to a claim of constructive discharge whether a plaintiff explored alternative avenues to resolve the alleged discrimination, but the plaintiff's actions must be considered in light of the totality of circumstances. *Clowes* simply recognizes that, in many cases, a reasonable person will not react to minor

harassment or workplace disturbances by heading straight for the exit and that, in others, the harassment or discrimination may be so severe that any reasonable person would feel compelled to walk out immediately.

Based on our existing jurisprudence, then, we reiterate that a plaintiff-employee alleging a constructive discharge in violation of Title VII must establish the convergence of two factors: (1) he or she suffered harassment or discrimination so intolerable that a reasonable person in the same position would have felt compelled to resign; in that regard, although we cannot say as a matter of law that a single incident of discrimination is insufficient to show a constructive discharge, the employee has the burden of establishing that the discrimination surpassed a threshold level of intolerability; and (2) the employee's reaction to the workplace situation—that is, his or her decision to resign— was reasonable given the totality of circumstances; as to this factor, although it is relevant whether the employee explored alternative avenues to resolve the alleged discrimination before resigning, a failure to do so will not defeat a claim of constructive discharge where the working conditions were so intolerable that a reasonable person would have concluded that there was no other choice but to resign.

By its nature, the inquiry is "a heavily fact-driven determination." *Levendos*, 860 F.2d at 1230. When an employee meets his or her burden under this test, a constructive discharge operates as the functional equivalent of an actual termination. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1075 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129 (1997) ("Under the applicable law, a plaintiff who voluntarily resigned may maintain a case of constructive discharge when the employer's allegedly discriminatory conduct creates an atmosphere that is the *constructive equivalent* of a discharge.") (emphasis added) (citations omitted); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987) ("When a constructive discharge is found, an employee's resignation is treated— for the purpose of establishing a prima facie case of employment discrimination—as if the employer had actually discharged the employee.").

Applying the law to the present case, it is clear that Suders has raised genuine issues of material fact relating to her claim of constructive discharge. As we noted with respect to her claim of a sexually hostile work environment, the harassment that she claimed to have endured was persistent, ongoing, and severe. Prendergast made it clear, through repeated acts of intimidation and his direct statements, that Suders was not wanted at the station. To be subjected to Baker's wrestling routine on a nightly basis, along with his and Easton's conversations of bestiality, oral sex, and genital piercing, would have been intolerable to any reasonable person. The conduct of the PA State Police officers at the McConnellsburg barracks drove Suders to draft a resignation letter.

If the harassment was limited to the type of conduct described above, we find that disputed issues of fact would have precluded summary judgment on Suders's constructive discharge claim, notwithstanding the PA State Police's argument that she failed to avail herself of an effective complaint procedure. Arguably, Suders made only one serious attempt on August 18, 1998, to resolve her problems within the remedial program established by the PA State Police. Furthermore, the two days that she waited before resigning did not give her employer a chance to remedy the problems at the McConnellsburg barracks. Nevertheless, whether Suders's work environment was objectively intolerable and whether a reasonable person in her position would have felt compelled to resign would remain open issues.

Any shred of doubt, however, is removed when considering the events of Suders's final day on the job. Drawing all reasonable inferences in her favor, Suders presented evidence sufficient to enable a reasonable finder of fact to conclude that the officers attempted to set her up on a false charge of theft. The concealment of her test results in a set of drawers in the women's locker room, the use of theft detection powder to catch one of their own inside the station, and the excessive and humiliating treatment that Suders suffered when she was handcuffed and photographed all point to a pattern of conduct designed to find some way to terminate Suders. In that

respect, the facts of this case bear a resemblance to *Levendos*, where we reversed the district court's grant of summary judgment on a claim of constructive discharge, in part, because plaintiff, a maitre d' and pastry chef, presented evidence that her employer had placed wine bottles in her locker to make it appear as if she was stealing. 860 F.2d at 1228, 1231. We also believe that this type of conduct—false charges of theft or other manufactured ploys designed to incriminate an employee—is sufficiently similar to the first and second situations identified in *Clowes*, 991 F.2d at 1161. In other words, false charges of misconduct are tantamount to threats or suggestions of discharge. Attacking someone with a false charge of theft seems a most effective way of suggesting that an employee will be fired or should leave voluntarily.

Of course, it is unclear at this stage of the litigation whether a finder of fact would ultimately conclude that Suders had no other reasonable alternative but to resign. That is not, however, our concern in reviewing a motion for summary judgment. Based on the evidence presented, it is equally plausible that a jury would conclude that Suders suffered intolerable sexual harassment and that the officers set her up on a false theft charge. For these reasons, the District Court erred in failing to address Suders's claim of constructive discharge. We hold that Suders has raised genuine issues of material fact relating to her claim of constructive discharge that preclude the grant of summary judgment.

## C. Is a Constructive Discharge a Tangible Employment Action?

Having found that a grant of summary judgment on Suders's claim of constructive discharge would have been improper, the issue remains whether the presence of the constructive discharge claim alters the balance of the District Court's judgment as to the liability of the PA State Police. Without analysis, the District Court permitted the PA State Police to assert the affirmative defense to vicarious liability and, as a result, to prevail on summary judgment. As we briefly noted at the outset of our opinion, *Ellerth* and *Faragher* hold that an employer is strictly liable to a victimized employee for the harassment or discrimination of

its supervisors if the harassment or discrimination resulted in a tangible employment action. In that case, an employer is precluded from invoking the affirmative defense. If, however, the harassment or discrimination did not amount to a tangible employment action, the employer is entitled to assert the affirmative defense. It seems the District Court bypassed the critical issue in this case: whether a constructive discharge, when proved, constitutes a tangible employment action. We hold that it does.

### 1. *Ellerth* and *Faragher*

An understanding of the Supreme Court's decisions in *Ellerth* and *Faragher* is essential to the issues on appeal. In both cases, plaintiffs alleged that they endured near-constant sexual harassment at the hands of their supervisors. *Ellerth*, 524 U.S. at 747; *Faragher*, 524 U.S. at 780. The harassment included uninvited and offensive touching, lewd remarks, and crude propositions. Both plaintiffs also sought to hold their employers liable pursuant to Title VII for the harassment of their supervisors. Although the plaintiff in *Ellerth* had also alleged that her supervisor threatened to deny her tangible job benefits if she did not submit to his thinly-veiled demands for sexual favors, the alleged threats never materialized.[8] *Ellerth*, 524 U.S. 747-48. Therefore, despite this variance in the factual allegations, both plaintiffs stood in the same position with respect to Title VII, that is, they had properly stated claims for unlawful discrimination based on a sexually hostile work environment. *Id.* at 754 ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct.") (citations omitted).

The issue in both cases, therefore, was "whether an employer has vicarious liability when a supervisor creates a hostile work environment . . . ." *Id.*; *see also Faragher*, 524 U.S. at 780 ("This case calls for the identification of the

---

8. Ellerth's allegation of a *quid pro quo* scenario was based in part on an incident in which her supervisor, while making comments about her breasts, told her to "loosen up," warning that "I could make your life very hard or very easy at Burlington." *Id.* at 748 (citations omitted).

circumstances under which an employer may be held liable under Title VII . . . for the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment amounting to employment discrimination."). Before turning to its analysis, the Court noted that in the aftermath of its decision in *Meritor*, "Courts of Appeals have struggled to derive manageable standards to govern employer liability for hostile environment harassment perpetrated by supervisory employees. . . . [And] the Courts of Appeals have adopted different approaches." *Faragher*, 524 U.S. at 785.[9] Therefore, in *Ellerth* and *Faragher*, both decided on the same day, the Court sought to delineate "a uniform and predictable standard [for vicarious liability] . . . as a matter of federal law." *Ellerth*, 524 U.S. at 754.

In determining the scope of the vicarious liability of an employer for the sexual harassment of its supervisors, the Court turned to principles of agency law. Because the Title VII definition of "employer" includes "any agent," 42 U.S.C. § 2000e(b), the Court noted that "[i]n express terms, Congress has directed federal courts to interpret Title VII

---

9. The confusion among the Courts of Appeals was due in part to the terminology employed in *Meritor* to describe different types of Title VII sexual harassment cases. In *Meritor*, the Court distinguished cases where an employer demands sexual favors in return for job benefits from cases where sexually demeaning behavior—not necessarily constituting a demand for sexual liberties—alters the terms and conditions of employment. *Meritor*, 477 U.S. at 65; *see also Ellerth*, 524 U.S. at 752. The Court referred to the former as *quid pro quo* claims and the latter as hostile environment claims. The purpose of the distinction is simply to provide a "rough demarcation" between types of sexual harassment. *Ellerth*, 524 U.S. at 752.

The Court held that both were cognizable under Title VII, but that a plaintiff claiming a hostile work environment was required to show harassment that was severe or pervasive. *Meritor*, 477 U.S. at 67. Although the Court did not suggest that these terms should bear on the issue of vicarious liability, the categories acquired a significance of their own. Some Courts of Appeals interpreted *Meritor* to mean that vicarious liability is appropriate when a plaintiff establishes a *quid pro quo* claim. *See Ellerth*, 524 U.S. at 753 (citing cases). This development encouraged plaintiffs to state their claims as *quid pro quo* claims, when in fact, the distinction was never meant to inform the vicarious liability analysis.

based on agency principles." *Ellerth*, 524 U.S. at 754. It also cautioned, however, that "common-law principles may not be transferrable in all their particulars to Title VII." *Id.* at 764 (quoting *Meritor*, 477 U.S. at 72). The appropriate starting point is the Restatement (Second) of Agency (1957) (the "Restatement"). *Meritor*, 477 U.S. at 72; *Ellerth*, 524 U.S. at 755.

The Restatement provision of direct relevance to this appeal is section 219(2),[10] which sets forth several situations in which an employer may be vicariously liable for the torts of its employees acting solely for their own purposes:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

---

10. Before turning to § 219(2), the Court left open the possibility of a limited basis for vicarious liability in § 219(1), which states that "[a] master is subject to liability for the torts of his servants committed while acting in the *scope of their employment*." Restatement § 219(1) (emphasis added). An action within the "scope of employment," is defined by other sections of the Restatement as one "actuated, at least in part, by a purpose to serve the [employer]." Restatement §§ 228(1)(c); *see also Ellerth*, 524 U.S. at 756-57. The Court recognized that when a supervisor commits sexual harassment, those actions generally are not actuated by a purpose to serve the employer. In fact, most employers today, it is hoped, condemn sexual harassment in the workplace, and the typical harassing supervisor acts on his or her own animus. *See id.*; *see also Faragher*, 524 U.S. at 793-94; *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 106-07 (3d Cir. 1994). Nevertheless, the Court left open the possibility that "a supervisor [may] engage[] in unlawful discrimination with the purpose, mistaken or otherwise, to serve the employer," for instance, where an employer has a policy of discouraging women from seeking advancement. *Ellerth*, 524 U.S. at 757.

We note that the record presented in Suders's appeal does not support the inference that the PA State Police officers were acting in the scope of their employment. Therefore, § 219(1) is not relevant to this appeal as a basis for imposing vicarious liability.

We leave aside other possible bases for liability that are not relevant to Suders's appeal: cases in which the position of the harasser makes him an alter ego of the employer; and cases in which the employee reasonably, but wrongly, believes that the harasser is a supervisor. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152 n.8 (3d Cir. 1999).

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was *aided in accomplishing the tort by the existence of the agency relation.*

Restatement § 219(2) (emphasis added); *see also* Restatement § 219, Comment e. As in *Ellerth* and *Faragher*, Suders does not allege that the PA State Police itself intended to harass her or that there is a non-delegable duty at issue. Therefore, subsections (a) and (c) of section 219(2) are not relevant to this appeal. Section 219(2)(b) might arguably apply if Suders had alleged that the PA State Police was negligent in that it "knew or should have known about" the harassment and failed to stop it. *See Ellerth*, 524 U.S. at 759. Because she conceded that she resigned only two days after making her first formal complaint to Smith-Elliott, Suders implicitly acknowledges that the PA State Police was not aware of what had transpired at the McConnellsburg barracks, thus precluding vicarious liability under subsection (b). Finally, Suders does not allege that the PA State Police officers purported to exercise authority that they did not have, and therefore, the "apparent authority" clause of section 219(2)(d) is also inapplicable here.

Thus, as in *Ellerth* and *Faragher*, vicarious liability must be premised on the second clause of section 219(2)(d), which provides for the vicarious liability of an employer for the tortious acts of an employee when the latter is "aided in accomplishing the tort by the existence of the agency relation." This has come to be known as the "aided in the agency relation standard." *Ellerth*, 524 U.S. at 759. In the context of Title VII, the Supreme Court recognized that "it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the

Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here." *Faragher*, 524 U.S. at 802.

While the Court found an appropriate starting point in the aided in the agency relation standard, it also recognized an inherent definitional problem: broadly speaking, most workplace harassment occurs because men and women are brought together as co-workers in close quarters. In that sense, all harassment is aided by the agency relationship put in place by employers. The Court cautioned that "[w]ere this to satisfy the aided in the agency relation standard, an employer would be subject to vicarious liability not only for all supervisor harassment, but also for all *co-worker* harassment, a result enforced by neither the EEOC nor any court of appeals to have considered the issue." *Ellerth*, 524 U.S. at 760 (emphasis added). In that regard, it is important to note the clear limitations of the aided in the agency relation standard as a basis for vicarious liability. Specifically, the Supreme Court recognized, and we reiterate here, a clear distinction between supervisors and co-workers. This recognition derives from the simple fact that, for purposes of liability, only supervisors, because of the authority vested in them by their employers and because of the rank they possess over others, may be aided by the agency relation in the commission of actionable harassment.[11]

---

11. *See Faragher*, 524 U.S. at 803. The Court noted that "[r]ecognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train them, and monitor their performance." *Id.*

In addition to the special relationship between employers and supervisors, harassment by a supervisor takes on different dimensions than harassment by a co-worker: "When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose 'power to supervise'—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear . . . when he chooses to harass through insults and offensive gestures rather than directly with threats

The distinction between supervisors and co-workers is a crucial limitation worth reiterating, but by design, it simply precludes vicarious liability under the aided in the agency relation standard for a category of would-be harassers, co-workers. The distinction does not fundamentally alter the breadth of § 219(2)(d) as written. Without further qualification, the aided in the agency relation standard risks holding the employer "automatically" liable for a supervisor's harassment without regard to the nature of the supervisor's conduct, a result that the Court forbade in *Meritor*, 477 U.S. at 72. *See also Faragher*, 524 U.S. at 804. Therefore, the Court found that in order to impose vicarious liability on an employer under the aided in the agency relation standard, "something more" would be required. *Ellerth*, 524 U.S. at 760.[12] The Court's resolution of this question reflects an intricate balance incorporated into a complex rule of law with multiple components.

of firing or promises of promotion." *Id.* (citing Estrich, *Sex at Work*, 43 STAN. L. REV. 813, 854 (1991)).

At oral argument, the PA State Police contended that none of the individual officers had the requisite authority to commit a tangible employment action because they could not discharge or demote Suders. We reject this attempt to rein in the scope of a supervisor within the meaning of *Ellerth* and *Faragher*. The record in this case clearly reflected that (1) Easton was responsible for the day-to-day supervision of the McConnellsburg barracks; and (2) both Baker and Prendergast had supervisory duties with respect to "running [their] shift[s]." App. at 215. No more is required to raise a genuine issue of material fact as to their supervisory authority.

We are not persuaded, however, that the actions of Smith-Elliot amounted to actionable harassment. Her supervisory authority over Suders was not clearly established in the record below. Although her conduct is relevant, especially to the affirmative defense, we strain to see how it alone substantiates a claim under Title VII. Nevertheless, in light of our remand, these issues may be addressed on the merits.

12. *See also Faragher*, 524 U.S. at 797 ("The proper analysis here, then, calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement . . . , but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's employment, and the reasons for the opposite view.").

First, the Court identified a class of supervisory actions for which more than the mere existence of the agency relation is unquestionably required for the commission of the alleged harassment: "when a supervisor takes a tangible employment action against the subordinate." *Id.* When a supervisor's actions result in a tangible employment action, the employer shall be strictly liable for the actionable harassment of its supervisors, without regard to an affirmative defense. *Id.* at 765; *Faragher*, 524 U.S. at 808.

The Court's discussion of the attributes of a tangible employment action is critical to the present appeal. In broad strokes, a tangible employment action "constitutes a significant change in employment status." *Ellerth*, 524 U.S. at 761. A tangible employment action is also defined by reference to a non-exclusive list of representative workplace actions, "*such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761 (emphasis added); *see also Faragher*, 524 U.S. at 790. In most cases, but not always, "a tangible employment action . . . inflicts direct economic harm." Finally, a tangible employment action implicates, in some meaningful way, the authority of the employer itself: "A tangible employment decision requires an official act of the enterprise, a company act. The decision *in most cases* is documented in official company records, and may be subject to review by higher level supervisors. . . . The supervisor *often must* obtain the imprimatur of the enterprise and use its internal processes." *Ellerth*, 524 U.S. at 762 (emphases added).

Second, when a supervisor's harassment does not amount to a tangible employment action, the Court found it unclear whether the aided in the agency relation standard should support vicarious liability. In that regard, we noted above that the risk of holding the employer "automatically" liable for the acts of its supervisors was too great. *Id.* at 763 ("[W]e are bound by our holding in *Meritor* that agency principles constrain the imposition of vicarious liability in cases of supervisory harassment.") (citations omitted). Nevertheless, for actions that fall short of a tangible employment action, but would otherwise be

actionable under Title VII, the Court did not give employers a free pass from liability. In cases where a supervisor's harassment does not result in a tangible employment action, the Court made available to employers an affirmative defense, an approach designed to further the well-recognized Title VII goals of encouraging anti-harassment policies and effective mechanisms for addressing employee complaints. *See id.* at 764; *Faragher*, 524 U.S. at 806.

Therefore, in both *Ellerth* and *Faragher*, the Court adopted the following holding:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08.

### 2. The Aftermath of *Ellerth* and *Faragher* and the Issue of Constructive Discharge in the Courts of Appeals

In light of the Supreme Court's guidance in *Ellerth* and *Faragher*, we reach the critical issue in this case: when a supervisor's harassment culminates in a constructive discharge, as Suders persuasively supported in her opposition to the motion for summary judgment, may her employer assert the affirmative defense to liability? As our analysis above demonstrates, the issue may be reduced

more simply to whether a constructive discharge constitutes a tangible employment action. We recognize that constructive discharge did not appear in either the Supreme Court's discussion pertaining to what constitutes a tangible employment action or the list of representative employment actions. This absence is not dispositive, however, as a claim of constructive discharge was not before the Court in either of the two cases. Therefore, the principles underlying a tangible employment action, together with the relevant agency and Title VII concerns, should guide our inquiry.

The PA State Police argues on appeal that a constructive discharge does not constitute a tangible employment action and that its position is supported by case law from other jurisdictions. We recognize a division among the Courts of Appeals as to this issue. A survey of the courts that have addressed the issue reveals a number of different approaches.

The PA State Police correctly notes that the Court of Appeals for the Second Circuit has held that a "constructive discharge does not constitute a 'tangible employment action,' as that term is used in *Ellerth* and *Faragher*." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir. 1999), *cert. denied*, 529 U.S. 1107 (2000). In *Caridad*, the court based its decision on three grounds. First, the court noted that "[c]o-workers, as well as supervisors can cause the constructive discharge of an employee." *Id.* Second, "unlike demotion, discharge, or similar economic sanctions, an employee's constructive discharge is not ratified or approved by the employer," *id.*, which would seem to contravene the Supreme Court's observation in *Ellerth*, that a tangible employment generally requires a "a company act." 524 U.S. at 762. Third, the Second Circuit suggested that in *Ellerth*, the Supreme Court implicitly addressed the issue of constructive discharge and that its holding does not permit the conclusion that such action constitutes a tangible employment action:

> Moreover, the facts of *Ellerth*, where the plaintiff, like Caridad, did not complain of the harassment prior to quitting her job, indicate that constructive discharge is

not a tangible employment action depriving the employer of the availability of the affirmative defense to Title VII liability. Ellerth alleged that she had been constructively discharged as a result of sexual harassment by her supervisor . . . ; in remanding the case for a determination of whether the employer could make out an affirmative defense, the Supreme Court noted that 'Ellerth has not alleged she suffered a tangible employment action at the hands of [her supervisor].'[13] *Caridad*, 191 F.3d at 294-95 (citations omitted).

Recently, the Court of Appeals for the Sixth Circuit, in an unpublished opinion, has adopted the holding in *Caridad* that a "claim of constructive discharge is not a tangible employment action for purposes of *Faragher* and *Burlington*." *Turner v. Dowbrands, Inc.*, No. 99-3984, 2000 WL 924599, at *1 (6th Cir. June 26, 2000); *see also Keaton v. State of Ohio*, No. C2-00-1248, 2002 WL 1580567, at *9 (S.D. Ohio June 3, 2002).[14] In addition, other district courts

13. We believe that the particular factual circumstances in *Caridad* shed some light on the court's decision there and distinguish that case from the present. Plaintiff in that case had consulted defendant's Director of Affirmative Action. She told the Director that she was being sexually harassed, without telling him the details of any incidents. The Director responded that it would be impossible to take further action without the details of the sexual harassment to which she alluded. Even still, the Director offered to transfer plaintiff to another shift, but she declined this and the offer to investigate further.

The court underscored plaintiff's reluctance to take advantage of the remedial measures in place, noting that plaintiff "did not complain of the harassment prior to quitting her job," thus indicating that "a constructive discharge is not a tangible employment action." *Caridad*, 191 F.3d at 294. We believe that all of these probative facts as to plaintiff's failure to provide details and to cooperate with the Director are clearly relevant, but more to the issue of whether there was a constructive discharge in the first place. We do not believe that these facts should bear upon the question of whether a constructive discharge would constitute a tangible employment action.

14. Several district courts have also adopted the holding in *Caridad* for substantially the same reasons advanced by the Second Circuit. *See Scott v. Ameritex Yarn*, 72 F. Supp. 2d 587, 594 (D.S.C. 1999); *Desmarteau v. City of Wichita, Kansas*, 64 F. Supp. 2d 1067, 1079 (D. Kan. 1999); *Alberter v. McDonald's Corp.*, 70 F. Supp. 2d 1138, 1147 (D. Nev. 1999).

aligning themselves with the Second Circuit have rejected the notion that a constructive discharge constitutes a tangible employment action on other grounds. For instance, in *Powell v. Morris*, the court held that a constructive discharge is not a tangible employment action because if the Supreme Court had intended to include constructive discharge, it "could have easily listed 'constructive discharge' along with the other incidents as constituting a tangible employment action." 37 F. Supp. 2d 1011, 1019 (S.D. Ohio 1999).

In contrast to the Second and Sixth Circuits, the Court of Appeals for the Eighth Circuit held that a constructive discharge, when proved, would constitute a tangible employment action. *See Jaros v. LodgeNet Entertainment Corp.*, 294 F.3d 960, 966 (8th Cir. 2002) ("The district court did not err in its instruction, since a constructive discharge constitutes a tangible employment action which prevents an employer from utilizing the affirmative defense.") (citations omitted); *Jackson v. Arkansas Dep't of Ed.*, 272 F.3d 1020, 1026 (8th Cir. 2001) ("If [plaintiff] was in fact constructively discharged, then the constructive discharge would constitute a tangible employment action and prevent the [defendant] from utilizing the affirmative defense."), *cert. denied*, 122 S. Ct. 2366 (2002). The Eighth Circuit, however, did not address the rationales advanced by the Second Circuit in *Caridad*.

Among the district courts, the leading case for the position contrary to *Caridad* is *Cherry v. Menard, Inc.*, 101 F. Supp. 2d 1160 (N.D. Iowa 2000). In a well-reasoned decision, the United States District Court for the Northern District of Iowa, presented a compelling counterpoint to the Second Circuit's decision in *Caridad*. In *Cherry*, the court found that "none of [the] reasons [advanced in *Caridad*] stands up to a probing scrutiny," and that "the court is not persuaded by [defendant's] argument, that a constructive discharge does not constitute a 'tangible employment action' as defined in *Ellerth/Faragher*." *Id.* at 1171, 1176.

Other district courts have followed *Jaros* and *Cherry*. *See Vasquez v. Atrium Door & Window Co. of Arizona, Inc.*, 218 F. Supp. 2d 1139, 1142 (D. Ariz. 2002) ("After careful consideration of the issue, the Court finds that a

constructive discharge constitutes a tangible employment action."); *Haworth v. Romania Imported Motors, Inc.*, No. CV 00-1721, 2001 WL 34041893, at \*8 (D. Or. Dec. 27, 2001) ("Under the reasoning provided by the Supreme Court in *Ellerth/Faragher*, constructive discharge constitutes a tangible employment action as the Court contemplated the term."); *Taylor v. United Regional Health Care System, Inc.*, No. CIV. A. 700CV145-R, 2001 WL 1012803, at \*6 (N.D. Tex. Aug. 14, 2001) ("[C]onstructive discharge and a failure to promote are 'tangible employment actions' for the purposes of Title VII.").

Other Courts of Appeals have noted the issue, but expressly declined to rule on it. *See Kohler v. Inter-Tel Technologies*, 244 F.3d 1167, 1179 n.8 (9th Cir. 2001) ("We have not yet determined whether a constructive discharge is a tangible employment action. . . . We do not reach this issue in this case because Kohler has waived her constructive discharge claim."); *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 666-667 (7th Cir.) ("First, it should be noted that we have yet to determine whether a constructive discharge is a tangible employment action within the meaning of *Ellerth* and *Faragher*. . . . However, we need not settle that issue today, for we find that [plaintiff] did not raise a genuine issue of material fact that she was constructively discharged.") (citations omitted), *cert. denied*, 534 U.S. 1041 (2001).

### 3. A Constructive Discharge, When Proved, Constitutes a Tangible Employment Action within the Meaning of *Ellerth* and *Faragher*

Although we are cognizant of this wide divergence of views among the Courts of Appeals, we disagree with the PA State Police's argument that a constructive discharge is not a tangible employment action. Our decision is based on the following observations: (1) although we have not definitively ruled on the issue, our recent decisions have suggested that a constructive discharge constitutes a tangible employment action; (2) none of the grounds advanced by the *Caridad* line of cases persuades us that a constructive discharge should not be held to constitute a tangible employment action; and (3) holding an employer strictly liable for a constructive discharge resulting from the

actionable harassment of its supervisors more faithfully adheres to the policy objectives set forth in *Ellerth* and *Faragher* and to our own Title VII jurisprudence.

At the outset, we note that although the present appeal marks the first time that we definitively address the issue of constructive discharge within the framework of *Ellerth* and *Faragher*, we are not writing on a blank slate. In *Cardenas v. Massey*, 269 F.3d 251, 266-67 (3d Cir. 2001), plaintiff alleged that he was subjected to a racially hostile work environment, resulting in his constructive discharge. In reversing the grant of summary judgment on plaintiff's hostile work environment claim, we noted that "[i]f Cardenas convinces a jury that he was victimized by a hostile work environment created by [defendants], it is certainly possible that the same jury would find that the hostile environment was severe enough to have precipitated Cardenas' resignation, i.e., a constructive discharge." *Id.* We also recognized that "[t]here appears to be some disagreement on whether constructive discharge constitutes a tangible employment action." *Id.* at 267 n.10. Nevertheless, we felt that in light of the particular facts and circumstances in *Cardenas*, the better result was to "leave this issue to the District Court in the first instance. For purposes of this discussion, we assume a constructive discharge is a tangible employment action." *Id.*

In addition, in *Durham Life*, 166 F.3d at 149 n.5, plaintiff also alleged sexual harassment and a constructive discharge. In that case, a majority of the panel was achieved by the concurrence of two of our colleagues. In discussing the reasons for the different perspectives of the panel members, the Court noted that "[Plaintiff] was the subject of a tangible adverse employment action, the District Court found that her supervisors were responsible for her constructive discharge and the District Court returned a verdict compensating her for the damages she suffered." *Id.* Furthermore, we suggested in clear terms that a constructive discharge would constitute a tangible employment action: "In a case such as this one, where [plaintiff] was constructively discharged by her supervisors' action after their own actionable behavior, the holdings and instruction of *Ellerth* and *Faragher* are clear: the employer,

37

Durham Life Insurance Company, is automatically liable and no affirmative defense is available."[15] *Id.* Despite this clear suggestion, our holding in *Durham Life* was ultimately based on employment actions unrelated to the constructive discharge—that is, we found that plaintiff had met her burden at trial of demonstrating a tangible employment action based on, *inter alia*, evidence that her supervisor had (1) dismissed her secretary; (2) removed files from her office which were vital to her work; and (3) allocated a disproportionate share of less lucrative assignments to her. *Id.* at 153-54. Therefore, notwithstanding the suggestions in *Cardenas* and *Durham Life*, one court noted in April 2002, that as to the issue of whether a constructive discharge constitutes a tangible employment action, "the Third Circuit explicitly has declined to resolve this issue." *Evans v. Nine West Group, Inc.*, No. CIV. A. 00-4850, 2002 WL 550477, at *9 (E.D. Pa. Apr. 15, 2002). We seek to resolve this issue today and to elaborate on the statements that we have already made as to the significance of a constructive discharge in the *Ellerth* and *Faragher* analysis.

In addition to our earlier suggestions in *Cardenas* and *Durham Life*, we are not persuaded that the grounds advanced in the *Caridad* line of cases compel the holding that a constructive discharge does not constitute a tangible employment action. We address first the argument in *Powell*, 37 F. Supp. 2d at 1019, that there is some meaning in the Supreme Court's exclusion of constructive discharge from the list of representative tangible employment actions. We disagree.

The Supreme Court made it clear that it intended to provide a non-exclusive list of clear cases of tangible employment actions, on the one hand, and broader categories, on the other. The Supreme Court stated that a "tangible employment action constitutes a significant

---

15. We also stated that "[u]nder Durham's theory, any substantial adverse action, such as a demotion in authority and pay, would not be a tangible adverse employment action if it led the affected employee to quit before the demotion took effect. This is contrary to Title VII doctrine, which recognizes a constructive discharge under such circumstances." *Durham Life*, 166 F.3d at 153.

change in employment status, *such as* hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth* 524 U.S. at 761 (emphasis added). Several aspects of this definition support our conclusion that it was intended to be non-exhaustive. As other courts have noted, the use of the qualifier "such as" indicates that tangible employment actions are not limited to those that follow the qualifier. *See Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 93 (2d Cir. 2002); *Cherry*, 101 F. Supp. 2d at 1175; *Vasquez*, 218 F. Supp. 2d at 1142-43. In addition, we observe that the list begins with specific actions that could constitute a tangible employment action—hiring, firing, and failing to promote—and ends with broader categories that could describe many different workplace actions—reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. By employing this structural technique, the Supreme Court recognized a simple reality of harassment in the modern workplace: tangible employment actions often take the form of subtle discrimination not easily categorized as a formal discharge or demotion.

Also, for the proposition that a tangible employment action is a flexible concept, not limited to the actions mentioned in *Ellerth*, we need look no further than our recent decision in *Durham Life*. There, as described above, we determined that a tangible employment action resulted where a supervisor (1) dismissed an employee's secretary, (2) removed her essential work files, and (3) allocated to her a disproportionate share of less lucrative assignments. *See Durham Life*, 166 F.3d at 153-54. Of course, none of these actions appear in the list set forth in *Ellerth*, which is entirely consistent with our finding that the Supreme Court intended to set forth a non-exclusive list of representative actions. *See id.* at 144 ("The concept of a tangible adverse employment action is not limited to changes in compensation, although Evans's pay was certainly affected by the actions taken against her. 'Tangible adverse employment action' includes the loss of significant job benefits or characteristics, such as the resources necessary for an employee to do his or her job . . . .").

Next, we address the court's reasoning in *Caridad* that the Supreme Court implicitly addressed and rejected constructive discharge as falling within the ambit of a tangible employment action. The court's reasoning was based on the fact that although plaintiff in *Ellerth* had initially alleged a claim of constructive discharge, the Supreme Court concluded that "[plaintiff] has not alleged she suffered a tangible employment action at the hands of [her supervisor]." *Ellerth*, 524 U.S. at 766. Based on our review of the procedural history of the case, however, we find that the claim of constructive discharge was never before the Court when it ruled. While it is true that plaintiff initially pleaded a claim of constructive discharge, the trial judge granted summary judgment as to that claim, noting that "it can not be said that [defendant] made [plaintiff's] working conditions intolerable forcing her into an involuntary resignation." *Ellerth v. Burlington Industries, Inc.*, 912 F. Supp. 1101, 1124 (N.D. Ill. 1996). When the matter reached the Seventh Circuit, the focus of the appeal was limited to plaintiff's claims of *quid pro quo* harassment and hostile environment harassment. *See Jansen v. Packaging Corp. of America*, 123 F.3d 490, 494 (7th Cir. 1997) (*en banc*) (consolidated with *Ellerth*).

By the time the matter reached the Supreme Court, the issues had narrowed even further: "The question presented on certiorari is whether [plaintiff] can state a claim of *quid pro quo* harassment, but the issue of real concern to the parties is whether Burlington has vicarious liability for [defendant's] alleged misconduct, rather than liability limited to its own negligence." *Ellerth*, 524 U.S. at 753. Simply put, plaintiff's claim of constructive discharge was never before the Supreme Court and, in fact, the Seventh Circuit barely addressed it. *See Cherry*, 101 F. Supp. 2d at 1174. Our conclusion is supported by the fact that constructive discharge does not appear anywhere in the Supreme Court's analysis. Therefore, we agree with the court in *Cherry*, that "the *Ellerth* decision left entirely open the question of whether a constructive discharge resulting from conduct of a supervisor can constitute the sort of 'tangible employment action' that deprives an employer of the *Ellerth/Faragher* defense." *Id.* at 1175.

In addition, the court in *Caridad* held that because "[c]o-workers, as well as supervisors, can cause the constructive discharge of an employee," it should not be construed as a tangible employment action. 191 F.3d at 294. This observation is beside the point. The Supreme Court recognized that many tangible employment actions may be perpetrated by either supervisors or co-workers. After all, supervisors and co-workers alike can make obscene gestures, lewd comments, sexual propositions, or steal another employee's clients. For the sake of recognizing reasonable limits to the aided in the agency relation standard, however, the Supreme Court made the categorical distinction between co-workers and supervisors and imposed vicarious liability only with respect to the actions of the latter. Furthermore, the Court noted that most, but not all, tangible employment actions are usually committed by supervisors. *Ellerth*, 524 U.S. at 762 ("As a *general proposition*, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.") (emphasis added). It is of no consequence that constructive discharge may be caused by a co-worker because we are only concerned here with that which is caused by a supervisor. And in that regard, our inquiry is not whether an action may be caused by a co-worker or supervisor, it is whether the supervisor's action constitutes a "significant change in employment status." *Id.* at 761.[16]

We turn to the final rationale advanced by the court in *Caridad*, the notion that, unlike termination or demotion,

---

16. As the court observed in *Cherry*, this argument "appears to be backwards: The panel in *Caridad* reasoned that a 'tangible employment action' must be a harm that only a supervisor can inflict, when the Supreme Court defined a 'tangible employment action' in terms of the harm it can inflict, observed that ordinarily, but not exclusively, only a supervisor can inflict such harm . . . , and then concluded that the 'aided in the agency relation' standard 'will always be met when a supervisor takes a tangible employment action against a subordinate.' Consequently, this court concludes that, under the Supreme Court's definition, it is the *nature of the harm* inflicted by a supervisor—that is, 'a significant change in employment status' or 'inflict[ion] of a direct economic harm'—that determines whether the supervisor's action is a 'tangible employment action,' not whether a co-worker could also inflict such harm." 101 F. Supp. 2d at 1172-73 (citations omitted).

constructive discharge is not ratified by the employer. It is true that in a constructive discharge situation, it is the employee who ultimately decides that he or she has no alternative but to resign. In that sense, as regards the specific event which terminates the employer-employee relationship, a constructive discharge may not bear the "imprimatur of the enterprise," *Ellerth*, 524 U.S. at 762, in the same way as a formal termination. We are not persuaded, however, that this distinction compels the conclusion that a constructive discharge is not a tangible employment action.

First, this view contravenes the fundamental principle of our jurisprudence that a constructive discharge, when proved, operates as the functional equivalent of an actual termination. *Sheridan*, 100 F.3d at 1075 (finding that a constructive discharge is the "constructive equivalent of a [formal] discharge"). This principle recognizes that when a plaintiff-employee successfully demonstrates that the work environment created by an employer was so intolerable that he or she had no choice but to resign, the constructive discharge becomes, for all intents and purposes, the act of the employer. There are sound reasons for adopting this legal construct. For instance, when a plaintiff-employee meets the stringent test of showing a constructive discharge, the direct economic harm suffered is identical to that of a formally discharged employee. *Cherry*, 101 F. Supp. 2d at 1173 ("constructive discharge constitutes precisely the same sort of 'significant change in employment status' and inflicts precisely the same sort of 'economic harm' as any other 'firing.' "); *see also Vasquez*, 218 F. Supp. 2d at 1142-43.

In addition, to the extent that *Caridad* suggested that only an action ratified by the employer and documented in official records qualifies as a tangible employment action, we disagree. As another panel of the Second Circuit noted: "though a tangible employment action 'in *most* cases is documented in official company records, and *may* be subject to review by higher level supervisors,' the Supreme Court did not require such conditions in all cases." *Jin*, 310 F.3d at 98 (emphases in original) (quoting *Ellerth*, 524 U.S. at 762). As we noted above, tangible employment actions

defy neat categories and an attempt to list them all would be futile. They occur within the context of each unique factual situation. Therefore, we agree that tangible employment actions are often ratified by an employer, and we should look first to official company records for relevant evidence. But by no means is a tangible employment action precluded solely because no documentation of a company act exists. *Ellerth*, 524 U.S. at 762.

In fact, in other Title VII contexts, courts have explicitly recognized that some of the most pernicious forms of workplace harassment, clearly amounting to tangible employment actions, are often not accompanied by official company acts. This is especially true in *quid pro quo* cases where a victimized employee submits to a supervisor's demands for sexual favors in return for job benefits, such as continued employment. In these cases, it is rare that a supervisor's demands for sexual liberties, and the corresponding threat of adverse consequences for failure to submit, will be documented anywhere in company records. Therefore, a rule requiring a victimized employee who submits to a supervisor's indecent demand for sexual favors to prove an official company act in order to establish a tangible employment action strains common sense. As the Second Circuit has held, the more sensible approach in the *quid pro quo* context is to recognize that, by his or her actions, a supervisor invokes the official authority of the enterprise:

> Finally, MetLife relies on a statement in *Ellerth* that "a tangible employment decision requires an official act of the enterprise, a company act." But, assuming Jin's allegations to be true, Morabito's use of his supervisory authority to require Jin's submission was, for Title VII purposes, the act of the employer. This is because Morabito brought "the official power of the enterprise to bear" on Jin by explicitly threatening to fire her if she did not submit and then allowing her to retain her job based on her submission.

*Jin*, 310 F.3d at 98 (citations omitted).

This rationale is equally applicable in the context of constructive discharge. By focusing on the actions of a

supervisor and on the type of injury to a plaintiff, it becomes clear that when a supervisor creates a hostile work environment so severe that an employee has no alternative but to resign, the official power of the enterprise is brought to bear on the constructive discharge.[17] In that regard, we find no sound justification for requiring more in constructive discharge cases than in *quid pro quo* cases in order to find a tangible employment action: an employee's constructive discharge is no more unilateral an act of the victimized employee and no less coerced by the employer than submission to sexual advances in a *quid pro quo* situation. Therefore, we reject any rule requiring a plaintiff-employee alleging a constructive discharge to show an official company act in order to prove a tangible employment action.

In any event, we note that, as a practical matter, a constructive discharge is often ratified by the employer. In the appeal of *Ellerth* to the Seventh Circuit, Chief Judge Posner remarked in his concurring opinion that "[t]he difficult borderline case is that of constructive termination precipitated by a threat. The termination will look to the supervisor's superiors like a voluntary quit. But since there is *always some paperwork involved in an employee's quitting*, the higher-ups in the company will have some ability to monitor constructive discharges, and I would therefore impose *strict liability* in such cases." *Jansen*, 123 F.3d at 515 (emphases added). The present case is a perfect illustration of this proposition. While it is true that Baker's repetition of the wrestling move five to ten times per evening might not be reflected in official PA State Police records, the circumstances of the allegedly false charge of theft are quite likely to be detailed in documents. Suders was handcuffed, photographed, and detained as a suspect, events that surely leave a paper trail. At a trial on the merits, the significance of these documented events may be

---

17. *See generally* Kerri L. Bauchner, *From Pig in a Parlor to Boar in a Boardroom: Why Ellerth Isn't Working and How Other Ideological Models Can Help Reconceptualize the Law of Sexual Harassment*, 8 COLUM. J. GENDER & L. 303, 331-32 (1999) (advocating a competing interests approach to sexual harassment cases which would give due regard to the injury suffered by a plaintiff).

judged by weighing Suders's testimony against that of the PA State Police officers. Thus, the documents surrounding Suders's departure may indeed reflect the imprimatur of the PA State Police to the extent that its supervising officers were trying to force Suders to quit, and we believe that she should have the opportunity to prove that. Moreover, because a constructive discharge will necessarily involve the termination of an employment relationship, the employer will be on notice and have the opportunity to determine the cause of the separation from employment. This too may be an appropriate line of inquiry for trial.

For these reasons, we are not persuaded by any of the grounds advanced by the *Caridad* line of cases for the proposition that a constructive discharge does not constitute a tangible employment action.

Lastly, we find that placing a constructive discharge within the rubric of tangible employment actions more faithfully adheres to the Supreme Court's guidance in *Ellerth* and *Faragher* and to our Title VII jurisprudence. At the outset, we reiterate that when a plaintiff-employee satisfies his or her burden of proving a constructive discharge, we view the resignation as the functional equivalent of an actual termination. *See Sheridan,* 100 F.3d at 1075. As noted above, we have not found any sound justifications for treating a constructive discharge differently from an actual termination in the tangible employment action analysis.

As we also noted above, a constructive discharge has, in most critical respects, the primary attributes of a tangible employment action, as defined in *Ellerth* and *Faragher.* In the same way as a formal discharge, a constructive discharge "constitutes a significant change in employment status," by ending the employer-employee relationship. *Ellerth,* 524 U.S. at 761. A constructive discharge also inflicts the same type of "direct economic harm." *Id.* at 762; *see also Cherry,* 101 F. Supp. 2d at 1173; *Vasquez,* 218 F. Supp. 2d at 1143.

Turning to our Title VII jurisprudence, we noted in *Andrews* that "Congress designed Title VII to prevent the perpetuation of stereotypes and a sense of degradation

which serve to close or discourage employment opportunities for women. . . . Such an objective can only be achieved if women are allowed to work without being harassed. Women who know that they will be subject to harassment will be deterred from joining the work force or accepting certain jobs."[18] 895 F.2d at 1483. We also recognized that, "[r]egrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms." *Aman*, 85 F.3d at 1081-82. In light of both the policies and the realities of workplace discrimination, we have always been mindful of the consequences and the intricate balance of incentives when adopting rules in the context of Title VII. *See Durham Life*, 166 F.3d at 154 (holding that requiring plaintiffs to report the first instance of discriminatory conduct "would have the perverse effect of putting a greater burden on plaintiffs who had extensive evidence of discrimination."); *see also Kolstad v. American Dental Ass'n*, 527 U.S. 526, 544 (1999) ("Applying the Restatement of Agency's 'scope of employment' rule in the Title VII punitive damages context, moreover, would reduce the incentive for employers to implement antidiscrimination programs."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (noting that the "exclusion of former employees from the protection of § 704(a) would undermine the effectiveness of Title VII by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC.").

In that regard, we emphasize that removing constructive discharge from the category of tangible employment actions could have the perverse effect of discouraging an employer from actively pursuing remedial measures and of possibly encouraging intensified harassment. When confronted with allegations of sexual harassment, employers have a wide range of options, including terminating the offending

---

18. *See also Faragher*, 524 U.S. at 805-06 (noting that primary purpose of Title VII is not to provide redress, but rather to avoid harm). This purpose served as the basis for making an affirmative defense available to an employer in the absence of a tangible employment action.

supervisor or stepping in and removing the victim from the hostile work environment by, for example, a transfer. But as our ever expanding Title VII caseload shows, there are instances when employers ignore these two alternatives and opt instead to either turn a blind eye or let their internal procedures run their course while the hostile work environment remains unchanged. With these realities in mind, if we were to hold that a constructive discharge does not constitute a tangible employment action, employers would undoubtedly catch on to the availability of the affirmative defense even if the victimized employee resigns from objectively intolerable conditions at work. Under such a rule, the temptation of employers to preserve their affirmative defense would be overwhelming in many situations. Some employers might wish for an employee to quit voluntarily; others might even tacitly approve of increased harassment to achieve that result. In any event, the benefits of stepping in to remedy the hostile work environment are measurably cloudier.

These are exactly the sorts of incentives that courts should take pains to avoid. If anything, our decision should be guided by the paramount policy objectives set forth in *Ellerth* and *Faragher*: "to prevent sexual harassment from occurring . . . [by] informing employees of their right to raise and how to raise the issue of harassment," and "to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor." *Faragher*, 524 U.S. at 806 (quotations and citations omitted). By holding that a constructive discharge constitutes a tangible employment action, we effectively encourage employers to be watchful of sexual harassment in their workplaces and to remedy complaints at the earliest possible moment; otherwise, they risk losing the benefit of the affirmative defense should victimized employees feel compelled to resign.

Nor do we believe that our holding today discourages responsible behavior on the part of victimized employees. Because of the stringent test for proving constructive discharge, as set forth in part III.B, *supra*, it is highly unlikely that employees will walk off the job at the first sign of harassment and expect to prevail under Title VII.

Because plaintiffs are expected to show intolerable conditions and reasonable responses to the alleged harassment, the strategy of resigning and then mixing constructive discharge with Title VII claims will ultimately fail in the absence of a *genuine* constructive discharge situation.

For the reasons set forth above, we hold that a constructive discharge, when proved, constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher*. With respect to her appeal, we hold that, because Suders raised genuine issues of material fact as to her claim of constructive discharge, the PA State Police is precluded from asserting the affirmative defense to liability advanced in support of its motion for summary judgment. These issues require a trial on the merits. Should Suders persuade the finder of fact that she was constructively discharged, the PA State Police shall be strictly liable for any actionable hostile environment. If Suders does not prevail on her claim of constructive discharge, the PA State Police may be entitled to invoke the affirmative defense. In any event, we will reverse the District Court's grant of summary judgment and remand for a disposition on the merits in accordance with our opinion.

## IV.

In summary, we concur with the District Court insofar as it held that Suders had raised genuine issues of material fact as to her claim of a sexually hostile work environment in violation of Title VII. Nevertheless, the District Court improperly granted summary judgment in favor of the PA State Police on the basis of the affirmative defense in *Ellerth* and *Faragher*. Specifically, we hold that the District Court erred in failing to address Suders's claim of constructive discharge. On the basis of the record presented to the trial court, we hold that Suders raised genuine issues of material fact as to her claim of constructive discharge. Finally, we hold that a constructive discharge, when proved in accordance with the requirements set forth above in part III.B, *supra*, constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher*. This precludes

the PA State Police's assertion of the affirmative defense in its motion for summary judgment.

In closing, we are cognizant of the possibility that our decision today may raise thorny evidentiary issues in the trial courts. In part III.B, *supra*, we noted that a plaintiff alleging a constructive discharge must establish the convergence of two factors: (1) harassment or discrimination so intolerable that a reasonable person in the same position would have felt compelled to resign; and (2) the employee's decision to resign was reasonable under the circumstances. As to the second factor, whether the employee explored alternative avenues to resolve the alleged harassment may be relevant, although a failure to do so may not prove fatal to the employee's claim. Conceivably, then, it may be relevant to a claim of constructive discharge whether an employer had an effective remedial scheme in place, whether an employer attempted to investigate, or otherwise to address, plaintiff's complaints, and whether plaintiff took advantage of alternatives offered by antiharassment programs. These are, of course, the same considerations relevant to the affirmative defense in *Ellerth* and *Faragher*.

The difficulty is that once a plaintiff proves a tangible employment action by establishing a constructive discharge, *Ellerth* and *Faragher* unequivocally hold that the employer is strictly liable for any actionable harassment without regard to the affirmative defense. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 808. Therefore, at the point at which a constructive discharge is proved, the considerations pertaining to the affirmative defense become irrelevant. *Durham Life*, 166 F.3d at 149 ("Although Durham presents extensive evidence and argument about its antiharassment policies, we find that they are *not relevant* to this case because Evans's supervisors took *tangible adverse employment action* against her.") (emphasis added). Consequently, there is a substantial risk that the test for constructive discharge may become a back door for the introduction of evidence amounting to the assertion of the affirmative defense to liability.

In a similar context, we noted the problems inherent in such a counterfactual inquiry. Defendant in *Durham Life*

argued that, even assuming plaintiff could prove a tangible employment action, the victimized employee should have reported the first instance of harassment, which would have allowed it to investigate and remedy the problem. 166 F.3d at 154. In response, we stated:

> [W]e decline to investigate whether, if Evans had complained early on, the sexual harassment policy at Durham would have prevented the tangible adverse actions that occurred afterwards. The difficulty of making such a counterfactual inquiry counsels against injecting this question into already-complex discrimination cases . . . . [W]ere we to allow an affirmative defense every time an employer could argue that the plaintiff had some non-tangible notice of discrimination *before* adverse action was taken against her, the *Ellerth/Faragher* distinction between cases with tangible adverse action and cases without such action would become hopelessly confused.

*Id.* (emphasis in original).

In the context of constructive discharge cases, however, there may be instances where District Courts have to engage in this complex inquiry. It is difficult to generalize about constructive discharge cases. The comparative merit, quantum of proof, and factual setting will differ markedly from case to case. Discovery and trial testimony may reveal any of the following: substantial proof of constructive discharge, the absence of an effective remedial program,[19] or an otherwise effective antiharassment program that failed to address a particular plaintiff's complaints. In those cases, courts should carefully weigh the relevance of

19. *See Faragher*, 524 U.S. at 808 ("While the City would have an opportunity to raise an affirmative defense if there were any serious prospect of its presenting one, it appears from the record that any such avenue is closed. The District Court found that the City had entirely failed to disseminate its policy against sexual harassment among the beach employees and that its officials made no attempt to keep track of the conduct of supervisors like Terry and Simpson. . . . Under such circumstances, we hold as a matter of law that the City could not be found to have exercised reasonable care to prevent the supervisor's harassing conduct.").

evidence relating to an employer's antiharassment program, in light of our observations in *Durham Life*.

Conversely, the evidentiary record may reveal scant support for a constructive discharge; or the evidence, while falling short of compelling, may raise genuine issues of material fact relating to the constructive discharge. In those cases, some evidence regarding an employer's antiharassment program or an employee's response to the alleged harassment may be admissible for the limited purpose of determining whether a constructive discharge has occurred.

In the final analysis, we rely on the wisdom and expertise of trial judges to exercise their gatekeeping authority when assessing whether all, some, or none of the evidence relating to employers' antiharassment programs and to employees' exploration of alternative avenues warrants introduction at trial. Of course, there may be instances when some evidence of this kind is admitted, yet the plaintiff ultimately prevails on a constructive discharge claim. In these cases, instructions to the jury regarding the admissibility of such evidence for limited purposes may cure any harm caused by its earlier introduction. Clear and concise jury verdict forms may also diminish the risk of confusion. Although these are complex issues, they are similar in kind to admissibility questions that trial judges are asked to decide on a regular basis.

For the reasons set forth above, we will reverse the judgment of the District Court as to Suders's Title VII claim against the PA State Police, and we will remand the case for a disposition of that claim on the merits consistent with our opinion.

A True Copy:
   Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*