Ruth BARRA, Appellant

v.

**ROSE TREE MEDIA SCHOOL
DISTRICT.**

Commonwealth Court of Pennsylvania.

Argued June 11, 2004.
Decided Sept. 17, 2004.

Edith A. Pearce, Philadelphia, for appellant.

Anne E. Hendricks, Huntingdon Valley, for appellee.

BEFORE: COHN JUBELIRER, Judge, and SIMPSON, Judge, and MIRARCHI, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Ruth Barra appeals the order of the Court of Common Pleas of Delaware County granting Rose Tree Media School District's (School District) Motion for Summary Judgment and dismissing her claims of gender and racial discrimination. She bases her claims upon: (1) the District's failure to hire her for the position of Director of Technology, (2) its failure to pay her additional wages for performing extra duties and (3) her constructive discharge due to a hostile work environment. On appeal, we must determine: (1) whether Barra's claims are barred by the applicable statute of limitations; (2) whether Barra exhausted her administrative remedies; (3) whether the School District fulfilled its burden of proving that no genuine issue of material fact exists regarding any of Barra's claims; (4) whether the trial court applied the correct standard of review; and (5) whether the School District's motion for summary judgment was sufficiently detailed.

Barra was hired by the School District on March 23, 1998, as a Network Specialist,[1] at an annual salary of $37,000. Prior to accepting this position, Barra attended the Chubb Institute and received computer training for five months. Before that,

---

1. Throughout her employment with the School District, Barra was the only Network Specialist employed. (Dep. Ruth Barra, 7/25/03, pp. 61–62).

from 1992–1997, she was employed as a customer service representative for Bell Atlantic. Barra was in the Navy from 1987–1992, where she was a cryptologic technician/operator and worked with satellite communications. Before enlisting in the Navy, Barra attended Bloomsburg University for approximately two years, although she did not declare a major and did not receive a college degree from either Bloomsburg or elsewhere.

About three months after Barra began working for the School District, the Director of Technology, Barra's supervisor, announced his resignation. Because no immediate replacement was available, the Director's duties were temporarily reassigned to other employees, including Barra. Barra's complaints against the School District began when she was not compensated for taking on these extra duties; she claims that the School District refused to pay her additional compensation because she is an African–American female.

While recruiting for a replacement, the School District decided to downgrade the Director's position to that of Supervisor. The qualifications for the Supervisor position were: (1) masters degree, preferred, with advance course work in a technology related field; (2) high degree of technical knowledge, required; (3) Pennsylvania certification in instructional technology, preferred; (4) at least 5 years experience in public education with experience in de-

veloping and delivering technology based integrated programs, preferred; and (5) ability to work in teams. Anne Callahan, Human Resources Administrator for the School District, testified that the search committee was particularly interested in a person who possessed, "[a] bachelor's degree and strong technical skills and experience in schools." (Callahan Dep. at 41.) Barra applied for the Supervisor of Technology position in October of 1998, although she admitted that she did not fulfill all of the requirements.[2] The successful candidate, Michael Norman, according to his resume—which later turned out to be falsified—had a Bachelor of Science degree in Library and Information Science, six years experience developing and delivering technology systems in public schools, several certifications, and other qualifications.[3] He had previously worked for the School District as a consultant. (Callahan Dep. at 42.) Norman was hired on November 16, 1998, as the Supervisor of Technology with a starting salary of $72,900. Barra argues that she should have been given this position or been paid the same as Norman prior to his hire, when, she alleges, she was performing the duties of that job.

In December, 1998, the School District posted the position of Information Systems Specialist. Barra claims that she did not apply for that position because it would have been "futile," because she had been

---

2. At the time of her application, Barra did not have an undergraduate degree; did not complete the required course work; did not have the preferred certification; and did not have the required experience in public education.

3. Norman resigned from his position on October 26, 2000, after the School District's superintendent requested his resignation, when it was discovered, *inter alia,* that he was using a district phone line for personal use and that computer equipment for which he was responsible was missing. (Callahan Dep. at 19,

44–46.) Further investigation, after his resignation, uncovered the fact that **he had falsified information** on his resume; he had completed only 1½ semesters at the University of Pittsburgh and had not completed his undergraduate degree; and he did not possess Microsoft or Novell experience. Anne Callahan, Human Resource Administrator for the School District, testified that Norman's educational background was not checked prior to his hire but that this is normal procedure. (Callahan Dep. at 34–35.)

discouraged from applying. She alleges that she would not have been hired because she is a "black female." (Barra Dep. at 101, 116.) The School District awarded the position to Kim McCann on January 21, 1999, with a starting salary of $49,000. The qualifications for the position included a Bachelor of Science degree in Information Systems Technology or a related field, or equivalent on-the-job experience. (Barra Dep. at p. 106.) At the time of her hiring, McCann had a Bachelor of Science degree in computer science, had completed several courses towards her Masters of Education in Technology and had almost nine years of relevant job experience.[4]

In addition to those items already mentioned, Barra complains about other aspects of her employment with the School District. She alleges, *inter alia*, that she was asked to perform tasks not required of her white co-workers, such as keeping a detailed log of her work day; that she was required to take employment proficiency tests that her white co-workers did not take; that she was required to produce a copy of her transcripts and certifications, while white co-workers were not; that her references were checked, although the references of white co-workers were not; that

she was paid less than white males performing the same job duties; that she was excluded from meetings which impacted upon her job responsibilities and duties; that she was not issued new keys allowing entrance to a school building to which she had previously been given access; that she received humiliating emails including reprimands from Mike Norman which he subsequently published to others; that she was given no performance evaluation; and, that her complaints about her treatment were not addressed.

Barra argues that she did not follow the School District's complaint procedures to seek resolution of her concerns, although she read the policy, because it did not cover the types of discrimination she encountered at the School District.[5] (Barra Dep. at 295–98.) Barra also argues that the School District's racial/ethnic/religious harassment/intimidation policy (harassment policy),[6] which she did not recall seeing before the date of her deposition, (Barra Dep. at 299), does not apply to discrimination. Barra was aware that the School District had some personnel policies in place and did not ask anyone in the School District about whether a racial harassment or discrimination policy was in

4. McCann had worked for the University of Pennsylvania from 1990 through 1997, in a position of the same name, and had worked the prior two years for Marple Newtown School District as the Coordinator of Instructional Technology. In that position, she was responsible for, *inter alia*, the acquisition, installation and maintenance of hardware and software, and the design, implementation and maintenance of the wide area network.

5. The School District's Board of School Directors approved a handbook, entitled "Rose Tree Media School District Administrators and Supervisors II Handbook on Compensation and Related Benefits, School Board Policy 3401.02," (Handbook), for the period from July 1, 1995 through June 30, 1999. (Barra Dep. at 295–96). The complaint procedure

referenced in the text was identified as Section 14 of this handbook, pp. 7–8. *Id.* That procedure, *inter alia*, states that an employee *"may* avail himself/herself of the following procedure if initiated within ten (10) working days of the alleged violation." (Handbook § 14(A)) (emphasis added). It further states that "[t]he Board does not intend to waive legal rights of the complainant. If the complainant elects to proceed by any other legal remedy, he/she shall waive his/her rights to proceed under this complaint procedure." (Handbook § 14(A)(7)).

6. The date of adoption of this policy, numbered 1050, was January 20, 1998. Attached to the written policy is a one-page form entitled "Racial, Ethnic, or Religious Harassment/Intimidation Complaint Form."

existence. (Barra Dep. at 300.) Barra alleges that she orally expressed her concerns to Anne Callahan, the Human Resources Director, and to Denise Kerr, the former Director of Curriculum for the School District. In her deposition, Barra explains that Anne Callahan refused to help her and describes one particular interaction:

> Anne specifically told me that there was nothing that she could do, that I needed to go back and resolve it with my supervisor, Mike Norman, and meet with Denise afterwards which I thought was completely inadequate assistance from her because those were the individuals that I was telling her were taking these actions against me.

(Barra Dep. at 185–87.) Barra also testified that she had a conversation with Denise Kerr, and "brought these issues forward ... and [Denise] told me that she didn't feel that any action needed to be taken, that there was no issue." (Barra Dep. at 218.)

On May 27, 1999, Barra resigned from her position, alleging that the discrimination and hostile work environment made her physically sick. Barra alleges that she was "forced to resign from her employment and/or constructively discharged from her position." (Barra Second Am. Compl. ¶ 19.) She then "dual-filed" charges of discrimination with the Equal Employment Opportunity Commission (EEOC) and with the Pennsylvania Human Relations Commission (PHRC). Her initial charge, dated November 4, 1999 and filed November 10, 1999 (November

charge), sought a remedy for alleged discrimination taking place between 9/98 and 5/27/99. A charge dated March 10, 2000, filed on March 14, 2000 (March charge), seeking a remedy for alleged discrimination taking place between 2/10/99 and 5/27/99, was served on the School District. The EEOC and PHRC determined that there was no basis for concluding that any statutes had been violated, and provided Barra with a right to sue letter. (Barra Second Am. Compl. Ex. B, D.)

In April of 2000, Barra instituted suit against the School District in the Court of Common Pleas of Delaware County on three counts: (1) unlawful gender and race discrimination in violation of Title VII;[7] (2) unlawful gender and race discrimination in violation of the Pennsylvania Human Relations Act[8] (PHRA); and (3) violations of the Equal Pay Act.[9] Barra alleged, *inter alia,* that the School District engaged in unlawful employment practices "by subjecting [her] to disparate treatment, racial and sex discrimination and harassment in the job place which created a hostile and offensive work environment for her as a black female...." (Barra Second Am. Compl. ¶ 9.) Barra further alleged that the School District denied her other positions of employment[10] because of her gender and/or race, (Barra Second Am. Compl. ¶¶ 16, 17), that she was forced to resign and/or was constructively discharged from her position, (Barra Second Am. Compl. ¶ 19), and that she was not paid commensurate with male employees in the School District engaged in "similar/comparable/equal work." (Barra Second Am. Compl. ¶ 24.)

---

**7.** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

**8.** Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963.

**9.** 29 U.S.C. § 206(d)(1).

**10.** Barra alleges she was denied the opportunity to interview and/or obtain three different positions: acting Director of Technology, Supervisor of Technology, and Information Systems Specialist. (Barra Second Am. Compl. ¶ 12.)

On August 8, 2003, the School District filed a Motion for Summary Judgment, to which Barra responded on September 2, 2003. On September 4, 2003, the trial court entered an order granting summary judgment to the School District on all counts of Barra's Second Amended Complaint, finding no genuine disputed issues of material fact as to necessary elements of Barra's causes of action or the School District's defenses. Barra appeals that order to this Court.

■ Barra's first argument concerns the appropriate date to determine the applicable limitations period for filing charges of discrimination. Under Title VII, a person claiming to be aggrieved by an alleged unlawful employment practice is required to file a complaint with the EEOC within 300 days after it occurred[11] and, under the PHRA, is required to file a complaint with the PHRC within 180 days after it occurred.[12] The trial court, however, determined that Barra's November charge could not be used to determine the applicable limitations period because it had not been "perfected," i.e., served on the School District,[13] and so the court used the date of the March charge. The court, therefore, concluded that any causes of action brought under Title VII for conduct prior to May 16, 1999 (300 days before March 14, 2000) were barred.[14] The trial court concluded that only the constructive discharge claim survived, and only under Title VII.

However, as noted above, the date of service of the charge does not determine the appropriate limitations period.[15] In fact, the service date is not relevant to this determination, as both Title VII and the PHRA refer exclusively to the date the charge was filed. Here, the evidence supports a finding that Barra filed a charge that met all EEOC and PHRC filing requirements in November,[16] and, therefore, the trial court should have used the November filing date to calculate the appropriate limitations dates for Barra's causes of action.[17]

11. An employee has 300 days after the alleged unlawful employment practice occurred to file a complaint with the EEOC, if he/she initially instituted proceedings with a state or local agency such as the PHRC, as she did here. 42 U.S.C. § 2000e–5(e). If the employee files only with the EEOC, he/she must file the charge within 180 days. *Id.*

12. *See* Section 9 of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 959(h).

13. The word "perfected" is used by the School District and the trial court to mean "served upon" or "given notice to."

14. The trial court, rather than counting beginning with the date of the alleged discriminatory conduct, effectively worked backwards, and determined the last possible date that discrimination could have occurred given the date that Barra filed her charge of discriminatory practices.

15. Under Section 2000e–5 of Title VII, a filed charge "shall be served upon the person

against whom such charge is made within ten days." 42 U.S.C. § 2000e–5(e)(1). The responsibility for serving the charge rests with the EEOC. *Id.* However, courts are reluctant to deny "judicial redress" to a plaintiff because the EEOC failed to act within an allotted time period. *McAdams v. Thermal Industries, Inc.*, 428 F.Supp. 156, 159 (W.D.Pa. 1977) (noting that if an individual meets the section 2000e–5 prerequisites (timely filing of charges with the EEOC and receipt of and timely acting upon a right to sue notice from the EEOC), "an individual is not jurisdictionally barred from suit in federal court merely because the EEOC failed to notify the employer of the charges against it within the time schedule proscribed in § 2000e–5(b)").

16. *See* 42 U.S.C. § 2000e–5(b); 43 P.S. § 959(a).

17. Pursuant to its rights under the Freedom of Information Act, the School District requested that the EEOC provide it certain documents relating to Barra's charges of discrim-

Initial correspondence between EEOC personnel and Barra's attorney indicate that the EEOC required Barra to complete additional forms before her complaint would be docketed and investigated.[18] (School District Br., Ex. A). On March 2, 2000, Barra received a letter from Genevieve Delaney, an Investigator with the EEOC, which stated:

> Enclosed is a "perfected" draft charge **prepared by me on the basis of your/ your attorney's recent correspondence to the [EEOC]**. . . . If the charge accurately reflects you[r] allegations, please sign and date the charge where indicated and return it to this office to my attention. Upon receipt of your signed charge, it will be docketed and a copy sent to the [School District]. . . .

(School District Br., Ex. A) (emphasis added). On July 6, 2000, the EEOC sent another letter to Barra concerning Charge Number 170A01000, which stated:

> Our records reveal that on November 10, 1999, initial correspondence was received from your attorney. On March 14, 2000, the Commission received your signed charge and the charge was docketed.

(R.R. at 1228a.) The EEOC then advised Barra that, in order to file a timely charge of discrimination under Title VII, "all claims on or before January 14, 1999 are time-barred for the purpose of the instant investigation." (R.R. at 1228a.) Thus, it is clear that the EEOC used the date the November charge was filed to calculate the 300-day statutory limitation period. With this date, Barra's causes of action under Title VII would be barred for conduct prior to January 14, 1999 (300 days before November 10, 1999), and under PHRA for conduct prior to May 8, 1999 (180 days before November 10, 1999).

The cases cited by the parties and the trial court involve complaints that, when initially filed, did not meet the statutory filing requirements, unlike the complaint Barra filed here. For example, in *Murphy v. Commonwealth*, 506 Pa. 549, 486 A.2d 388 (1985), when an appellant filed a complaint that was defective, the Supreme Court held that appellant's second pleading could not correct the first in an attempt to convey ex post facto jurisdiction for a period beyond the statutory limit. Also, in *Commonwealth Bank and Trust Company, N.A. v. Winterberger*, 136 Pa. Cmwlth. 216, 582 A.2d 730 (1990), *petition for allowance of appeal granted*, 527 Pa. 619, 590 A.2d 759 (1991), an employee filed a complaint beyond the statutory time limit. However, the Court determined that the delay was caused by administrative errors within the EEOC when trying to obtain the employee's notarized verification that had been missing and, thus, advised the Commission to treat the employee's complaint as having been timely filed. Likewise, in *Vintage Homes, Inc. v. Pennsylvania Human Relations Commission*, 135 Pa.Cmwlth. 590, 581 A.2d 1014 (1990), *petition for allowance of appeal denied*, 527 Pa. 660, 593 A.2d 429 (1991), the PHRC permitted a complainant to amend a complaint to change the name of the party designated as the respondent. The

---

ination. The EEOC complied with the School District's request, but the documents were received *after* the filing of the appeal with the trial court. Therefore, the documents were not presented to the trial court. However, both parties refer to information contained in these documents in their briefs.

18. The EEOC included, with its letter, questionnaires regarding allegations, hiring/promotion, performance and forced resignation, which the letter advised were to be completed by Barra within thirty-three days. There is no evidence in the record of when or if Barra completed the questionnaires and returned them to the EEOC.

Court did not consider this an amendment to enlarge the statutory time limit. Thus, these cases do not apply here.

While Barra's claim for failure to hire her as Supervisor accrued in November of 1998, and is untimely, her equal pay claim is viewed as beginning anew with each paycheck and survives the statute of limitations defense.[19] In addition, her claim for constructive discharge on May 27, 1999, alleged in the March charge and occurring subsequent to the cutoff dates of January 22, 1999 for Title VII and May 8, 1999 for the PHRA, also survives that defense.

Barra characterizes her next argument as one asserting that she has exhausted her administrative remedies. This is a misnomer; what she is really arguing is that the District's continued failure to hire her for various positions constituted a "continuing violation," an assertion that actually goes to her argument against the applicability of the statute of limitations defense. Barra seeks to relate the School District's alleged failure to pay her for performing the duties of what she calls the Acting Director of Technology position, to the School District's later failure to hire her for the positions of Supervisor of Technology or Information Systems Specialist. Thus, she contends that any discriminatory acts related to the "Acting Director position" were part of a continuing violation.

A plaintiff may rely on the continuing violation doctrine to recover for discriminatory acts that fall outside the 300-day limitations period. *National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In *National Railroad,* the Supreme Court explained how this occurs by describing the application and effect of the continuing violation doctrine on two types of discriminatory acts: discrete acts or those acts contributing to a hostile work environment. The Court held that a discrete act "occurred" on the date that it "happened." *Id.* at 110, 122 S.Ct. 2061. Each discrete act, therefore, constitutes a separate actionable unlawful employment practice, and starts a new clock for filing charges alleging that act. *Id.* at 113–14, 122 S.Ct. 2061. Consequently, discrete acts are not actionable if time barred, even when related to acts alleged in timely filed charges. *Id.*

On the other hand, the very nature of hostile work environment claims involves "repeated conduct" that "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may *not* be actionable on its own." *Id.* at 115, 122 S.Ct. 2061. Consequently, "[s]uch claims are based on the cumulative affect of individual acts." *Id.* Therefore, in determining whether an actionable hostile work environment claim exists, the Court is to look to " 'all circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Id.* at 116, 122 S.Ct. 2061 (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Furthermore, in contrast to discrete acts of discrimination,

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. **Provid-**

19. Barra's claim for violation of the Equal Pay Act is within the statute of limitations period because each week's paycheck is considered a wrong actionable under Title VII.

*See Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); *Cardenas v. Massey,* 269 F.3d 251 (3d Cir.2001).

ed that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 117, 122 S.Ct. 2061 (emphasis added). Thus, because of the effect of the statute of limitations in this case, Barra can only ultimately recover for claims of discrimination that are encompassed in a successful hostile work environment claim. She can be successful only if the claim survives the summary judgment motion, which we now address.

Summary judgment is appropriate where "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by discovery or expert report." Pa. R.C.P. No. 1035.2(1). The court is not to decide issues of fact, but merely to determine whether any such issues exist. *Boring v. Erie Insurance Group*, 434 Pa.Super. 40, 641 A.2d 1189 (1994). Credibility determinations must be left to the jury. *Larsen v. Philadelphia Newspapers, Inc.*, 411 Pa.Super. 534, 602 A.2d 324 (1991). Summary judgment is also warranted "if, after completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce sufficient evidence of facts essential to the cause of action or defense" to submit the question to a jury. Pa. R.C.P. No. 1032.2(2).

We are cognizant that an alleged victim in an employment discrimination case may have difficulty in meeting his or her burden of proof, as aptly described:

As the Supreme Court has noted, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." We have recognized that "[d]iscrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered." Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence. "This is true in part because ... discrimination ... is often subtle." "[A]n employer who knowingly discriminates ... may leave no written records revealing the forbidden motive and may communicate it orally to no one." "[D]irect evidence of an employer's motivation will often be unavailable or difficult to acquire."

*Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071 (3d Cir.1996) (citations omitted), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). Therefore, "[c]ourts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and 'a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled ... because of crabbed notions of relevance or excessive mistrust of juries.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir.1996) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987)).

 This Court's standard of review of a trial court's order granting summary judgment is limited to determining whether the trial court committed an error of law or abused its discretion. *Irish v. Lehigh County Housing Authority*, 751 A.2d 1201 (Pa.Cmwlth.2000), *petition for allowance of appeal denied*, 567 Pa. 732, 786 A.2d 991 (2001). In reviewing a grant of summary judgment, an appellate court "must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved

against the moving party." *State Farm Mutual Automobile Insurance Company v. Universal Underwriters Insurance Company,* 549 Pa. 518, 701 A.2d 1330 (1997) (citation omitted).

■ Barra claims that the School District failed to meet its burden of proof that no genuine issue of material fact exists as to her substantive claims and, therefore, that the School District was not entitled to summary judgment as a matter of law. We need consider this issue only with regard to the two, thus far, surviving claims: hostile work environment/constructive discharge and denial of equal pay.

■ To establish a prima facie case of hostile work environment under Title VII, an employee must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [her] employment." *Pennsylvania State Police v. Suders,* —— U.S. ——, ——, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004) (citations omitted). In addition, an employee who seeks to demonstrate a constructive discharge, as does Barra, must also show that "the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Id.* In particular, the plaintiff must demonstrate that (1) she suffered intentional discrimination because of her race or gender; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for respondeat superior liability. *Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir. 1997). Here, the trial court eliminated the constructive discharge as a cause of action, having found that Barra "has not proven, and cannot prove, the existence of respondeat superior liability on the part of the defendant." (Trial Ct. Op. at 13.)

The threshold question to establish the burden of proof for an employer's liability for a supervisor's harassment, is whether the plaintiff/employee suffered a tangible employment action. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). These two cases, decided the same day, define tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257.[20] The

---

**20.** Tangible employment actions:

"[F]all within the special province of the supervisor," who "has been empowered by the company as ... [an] agent to make economic decisions affecting other employees under his or her control." The tangible employment action, the Court elaborated, is, in essential character, "an official act of the enterprise, a company act." It is "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." Often, the supervisor will "use [the company's] internal processes" and thereby "obtain the imprimatur of the enterprise." Ordinarily, the tangible employment decision "is documented in official company records, and may be subject to review by higher level supervisors." In sum ... "when a supervisor takes a tangible employment action against a subordinate[,] ... it would be implausible to interpret agency principles to allow an employer to escape liability." (citations omitted).

When a supervisor's harassment of a subordinate does not culminate in a tangible employment action, ... it is "less obvious" that the agency relation is the driving force. We acknowledged that a supervisor's "power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." But we also recognized that "there are acts of harassment a supervisor might commit

Supreme Court determined that if *no* tangible employment action is taken, the employer may still be liable, but may raise a two-prong affirmative defense: (a) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (b) that the plaintiff/employee unreasonably failed to take advantage of any preventive or corrective measures provided by the employer or to otherwise avoid harm. *Pennsylvania State Police v. Suders*, — U.S. ——, ——, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004). However, it also held that if a tangible employment action is taken, this affirmative defense is *not* available because the agency relationship is clear and, thus, the employer becomes *strictly liable* to a victimized employee for the harassment or discrimination of its supervisors.

The Third Circuit subsequently decided *Suders v. Easton*, 325 F.3d 432 (3d Cir. 2003), a case cited here by both parties,[21] which expanded the breadth of *Ellerth* and *Faragher* by holding, *inter alia*, that a constructive discharge, if proved, constitutes a tangible employment action that renders an employer strictly liable and precludes reliance on the *Ellerth/Faragher* affirmative defense.[22] The Supreme Court granted certiorari in that case,[23] "to resolve the disagreement among the Circuits on the question whether a constructive discharge brought about by supervisor harassment constitutes a tangible employment action and, therefore, precludes assertion of the affirmative defense articulated in *Ellerth* and *Faragher*." *Pennsylvania State Police v. Suders*, — U.S. ——, ——, 124 S.Ct. 2342, 2350, 159 L.Ed.2d 204 (2004) (*Suders II*). *Suders II*, which was decided on June 14, 2004, three days after this Court held argument in the case sub judice, vacated the Third Circuit's judgment and remanded the case for further proceedings, holding:

> [A]n employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent

which might be the same acts a coemployee would commit, and there may be some circumstances where the supervisor's status [would] mak[e] little difference." (citations omitted).

*Pennsylvania State Police v. Suders*, — U.S. ——, ——, 124 S.Ct. 2342, 2353, 159 L.Ed.2d 204 (2004).

**21.** Barra relied on *Suders* for the proposition that "a constructive discharge, when proved, constitutes a tangible employment action within the meaning of *Ellerth* and *Faragher*. Consequently, when an employee has raised a genuine issue of material fact as to a claim of constructive discharge, an employer may not assert, or otherwise rely on, the affirmative defense in support of its motion for summary judgment." *Suders*, 325 F.3d at 435. The School District relied on *Suders* for the proposition that "a plaintiff claiming constructive discharge must demonstrate that the alleged discrimination surpasses 'a threshold of "intolerable conditions." ' " *Id.* at 444. It claims that Barra failed to allege any conduct that comes near the level necessary and/or

alleged in *Suders* to be considered a constructive discharge. (Barra Br. p. 52.)

**22.** In *Suders*, a female employee was subjected to a continuous barrage of sexual harassment by three male supervisors, which ceased only when she resigned her position with the state police. The supervisors conversed about people having sex with animals anytime the employee would enter the room. They opined in front of her that young girls should be given instruction as to how to gratify men with oral sex. One supervisor sat in front of the employee wearing spandex shorts and spread his legs apart. Another made obscene gestures in the employee's presence, as many as five-to-ten times per night, by grabbing his genitals and shouting out a vulgar comment inviting oral sex. Another supervisor would "rub his rear end in front of [the employee] and remark 'I have a nice ass, don't I?' " *Suders*, 325 F.3d at 437.

**23.** *See* — U.S. ——, 124 S.Ct. 803, 157 L.Ed.2d 692 (2003).

such a "tangible employment action," however, the defense is available to the employer whose supervisors are charged with harassment.

*Id.* at 2351. The Court explained that "[a]bsent 'an official act of the enterprise,' ... as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force." *Id.* at 2355 (citation omitted).

In this case, Barra does not allege a single event that could be termed a "supervisor's official act" that precipitated her discharge. She alleges that she was given a heavier workload than others; she was required to maintain a daily log of her work and work locations; she was not invited to meetings with vendors; her office keys were taken when the locks were changed on the Education Center; she was not given a performance evaluation; and she received numerous critical, insulting e-mails from her supervisor. However, none of these actions rise to the level of an "official act" of a supervisor, and Barra has not alleged that any individual event caused her alleged constructive discharge. Without reference to a "supervisor's official act" as the cause of her discharge, Barra is unable to claim the constructive discharge as a tangible employment action, under *Suders II*, that would bar the School District from raising the affirmative defense available under *Ellerth/Faragher*.

Proof that an employer has in place, a policy suitable to particular employment circumstances, may demonstrate an employer's reasonable care under the first prong of the *Ellerth/Faragher* test. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In pleading the affirmative defense, the School District alleges that it had a discrimination policy and complaint procedures in place that were either given to or readily available to all employees. However, following our evaluation of the policy and procedures presented by the School District, we must disagree for the following reasons.

First, the School District's policy, entitled "Racial/Ethnic/Religious Harassment/Intimidation" policy, by its own terms, does not address discrimination and does not address gender. Rather, the policy states that it was written to address "hate-based conduct that either directly or indirectly causes intimidation, harassment or physical harm to another member of the school community, or disrupts the educational process...." (R. at 227a.) Notably, it is telling that the word "discrimination" is not used once in the policy. We note also that the School District failed to provide any other policy to this Court.

Further, the policy states that it was "intended to be in compliance with Title VI of the Civil Rights Act of 1964, and the guidelines adopted by the Pennsylvania Human Rights Commission [and] the 1982 Ethnic Intimidation and Institutional Vandalism Act," (R. at 227a.) rather than Title VII and the Pennsylvania Human Relations Commission, as is relevant to Barra's case.

In addition, the policy describes unacceptable conduct as including the following:

1. Making remarks directly or indirectly, such as name-calling, fighting words, racial slurs or "jokes," that demean individuals or groups.

2. Physically threatening or harming individuals or groups.

3. Damaging, defacing or destroying the private property of any person because of that person's race, ethnicity, or religious affiliation.

4. Harassment is defined as a repeated pattern of unprovoked aggressive behaviors of a physical and/or psy-

chological nature carried out by an individual or group against an individual or a group with the effect of causing harm or hurt. Harassing behaviors are all those behaviors that are unwelcome, unwanted and uncomfortable in the view of the recipient.

(R. at 227a.) These behaviors are all active, aggressive manifestations of bias or hate and, while they can be considered discriminatory conduct, they do not include what is commonly considered invidious discrimination in the workplace.

Because the School District failed to prove that it has an applicable policy in place, it cannot meet the requirements of the first prong of the affirmative defense, and it is then unnecessary to evaluate its proof regarding the requirements of the second prong. Therefore, unable to rely on the affirmative defense, the School District may be found strictly liable to Barra under the doctrine of respondeat superior for the actions of her supervisor, if they rise to the level of creating a hostile work environment. Barra alleges, *inter alia,* that she suffered discrimination because of her race and gender, that it was pervasive and regular, that it detrimentally affected her, and that it would have a similar effect on a reasonable person of the same sex in her position. Evaluating all of these allegations in the light most favorable to her, if found credible, we cannot say as a matter of law that she would be unable to recover on a claim for a hostile work environment. Accordingly, the trial court erred when it concluded that the School District was entitled to summary judgment on this issue.

■ Barra further contends that the trial court erred when it dismissed her claim for a violation of the Equal Pay Act. We agree.

The Equal Pay Act provides, in pertinent part:

(d) Prohibition of sex discrimination.

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . .

29 U.S.C. § 206(d). An employer may show that a pay differential is justified under one of the Act's four exceptions. *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

Here, we find that Barra has raised issues of fact as to whether the School District discriminated against her with regard to her wages on the basis of sex. Barra claims that: (1) she has been employed by the School District doing substantially equal work on a job or jobs, the performance of which requires substantially equal skill, effort and responsibility as jobs held by men; (2) the job or jobs are performed under similar working conditions; and (3) she has been paid a lower wage than a member of the opposite sex doing equal work. *See* 29 U.S.C. § 206(d); *Corning Glass Works,* 417 U.S. at 195–96, 94 S.Ct. 2223. These issues of fact must be resolved before the cause of action can be dismissed. Therefore, the trial court

should not have granted summary judgment on Barra's claim regarding the School District's alleged violation of the Equal Pay Act.

■ Finally, Barra argues that the School District's motion for summary judgment was insufficient because it is "boilerplate," and consists of a single statement requesting summary judgment, with no supporting facts, argument or exhibits other than those referenced in its memorandum of law. She also alleges that this prevents the Court from obtaining a clear understanding of the exact theories advanced and the facts allegedly supporting such theories. We disagree. A motion is not required to be pled with specificity; there is no rule in either the local rules of Delaware County or the Pennsylvania Rules of Civil Procedure that requires the School District to state all of the issues in numbered paragraphs in its motion.[24] Furthermore, as the preceding analysis shows, the Court was fully able to obtain a clear understanding of the theories and the facts from the motion as presented.

We may affirm a grant of summary judgment only in cases that are free and clear of doubt. *State Farm.* Because our analysis has uncovered the existence of genuine issues of material fact, the order of the trial court must be reversed and this case remanded for further proceedings consistent with this opinion.[25]

### ORDER

NOW, September 17, 2004, the order of the Court of Common Pleas of Delaware County in the above-captioned case is hereby reversed to the extent it granted the School District's motion for summary judgment and this case is remanded for further proceedings.

Jurisdiction relinquished.

---

24. Although Pa. R.C.P. No. 208.2 now requires numbered paragraphs, Rule 208.1 specifically excludes motions for summary judgment from the requirements of Rule 208.2. In addition, Rule 208.2 was not effective at the time the motion for summary judgment was filed.

25. Barra also claims that the trial court applied an incorrect method of evaluating the evidence. She argues that the School District's actions constitute direct evidence of discrimination. The School District and the trial court assert that the pretext method should be applied. Because of our disposition of this case, we need not reach that issue.